### VERMONT TRANSIT CO., INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34152.   Promulgated March 10, 1953.

*Guy M. Page, Esq.*, and *Charles W. Tye, Esq.*, for the petitioner.
*Lester H. Salter, Esq.*, for the respondent.

#### OPINION.

RAUM, *Judge:* The respondent determined deficiencies in the income tax of the petitioner for the years 1942 and 1943 in the amounts of $11.19 and $178.92, respectively. Petitioner contested the deficiencies and claimed overpayments for each year. Certain issues raised by the petitioner have since been abandoned. The sole remaining issue is whether amounts of $54,262.18 and $37,347.78 were properly included in its gross income for 1942 and 1943, and, if so, whether corresponding deductions in the same amounts should be allowed.

The facts have been stipulated and are so found. The petitioner, Vermont Transit Co., Inc., is a Vermont corporation organized in 1929. It has kept its books on the accrual method of accounting on a calendar year basis. It filed its returns for the years here involved with the collector of internal revenue for the district of Vermont.

The petitioner was engaged primarily in the business of a common carrier of passengers by motor vehicle over regular routes in Vermont, New Hampshire, Massachusetts, Maine, and New York. It operated under certificates granted by the Interstate Commerce Commission and some of the foregoing states. A portion of its routes was also served by a similar carrier, Frontier Coach Lines, Inc. (hereinafter referred to as "Frontier").

Frontier, which for some time had been operating at a loss, approached petitioner in 1939 in an endeavor to negotiate a sale of some of its operating rights (hereinafter also referred to as the "rights" or "franchises"). Such a sale appeared to be advantageous to both parties. Absentee management and lack of proper maintenance facilities played an important role in Frontier's losses. No such circumstances were present in the case of petitioner, and there was reasonable grounds for belief that petitioner could do better with these

operating rights than Frontier had done. At some stage in the negotiations, Frontier indicated an asking price of $25,000 for the rights, which were valued, as intangible assets, on its books at $12,872. The petitioner insisted that the franchises had a nominal value only. Both parties desired to effectuate a purchase and sale, but they could not agree on a purchase price under the existing conditions.

It was, therefore, agreed on August 14, 1940, that Frontier would lease the rights to petitioner until December 31, 1945, granting petitioner an option to renew the lease for an additional 5 years. On August 26, 1940, the parties entered into a further agreement whereby petitioner was given an option to purchase the rights at a price to be agreed upon by the parties. An arbitration procedure was provided in the event that the parties failed to agree upon a purchase price. The pertinent provisions of the lease are summarized briefly as follows: Petitioner was to recover its expenses in operating the franchises on a stipulated amount per mile basis, the exact amount per mile depending on the passenger capacity of the buses used. This amount which was to be computed monthly was known as the "primary amount." All revenues from operation of the routes in excess of the primary amount were to be deposited monthly into an escrow account, unless there were unrecovered deficits in the primary amounts computed in previous months in the same calendar year. An accounting was to be rendered annually before any withdrawals were made from the escrow account. Funds in excess of the primary amount were to be paid to Frontier on the basis of one cent per mile travelled in operation of the routes. That amount was known as the "secondary amount." Any revenues remaining were to be apportioned 75 per cent to the petitioner and 25 per cent to Frontier. Frontier agreed to keep a certain line in operation in order to provide a connection with the routes leased by the petitioner. The lease was to go into effect when approved by the Interstate Commerce Commission (hereinafter called the "Commission").

Petitioner made application to the Commission for approval of the lease and option to buy, and a hearing was given before an examiner. The examiner submitted a proposed report recommending denial of approval of the agreement because it was thought that Frontier's predicament would only be increased if at the termination of the lease petitioner decided not to purchase the rights. The proposed denial of approval was without prejudice to the submission of an agreement pertaining to immediate purchase of the operating rights.

No exceptions were filed to the proposed report of the examiner and a supplemental application was filed with the Commission on February 10, 1941. This application requested approval of a purchase agreement entered into on February 4, 1941, between petitioner and

Frontier. The agreement referred to the parties as "buyer" and "seller." The provisions of the purchase agreement were similar in many respects to the provisions of the lease. The seller was to "irrevocably transfer" the title to the operating rights 120 days after the Commission approved and authorized such transfer. The buyer, petitioner, was to pay $3,500 to the seller when title was transferred. The primary and secondary amounts were to be computed in the same manner as in the lease agreement except that the buyer was to recover $3,500 in excess of the primary amount prior to making any deposits into the escrow account. The funds remaining in excess of the primary and secondary amounts were to be divided equally between the parties. The arrangement for payments into escrow and the disposition of the funds so deposited, as outlined above, was to be operative for a period of 5 years. The seller reserved the right to inspect the books of the buyer. The seller again promised to maintain a connecting route with the buyer's routes and the buyer ,promised not to change or discontinue any of the acquired routes without the seller's approval. By an order dated May 4, 1941, the purchase was approved and authorized by the Commission; title to the rights was transferred on July 1, 1941; and an escrow agreement was entered into with a Burlington, Vermont, bank.

The following year a deviation in routes was agreed to by Frontier, in accordance with the requirement of the agreement. In February 1943, the parties agreed to raise the rate per mile used in computing the primary amount and the change was approved by the Commission.

The amounts of $54,262.18 and $37,347.78 represent the difference between the revenues paid into the escrow account in 1942 and 1943, and the amounts petitioner received back from escrow in those years. The petitioner asserts that it received no benefit from those funds since they were collected by petitioner for Frontier. It urges that Frontier reserved an economic interest in the operating rights and that therefore the inclusion of those amounts in gross income in 1942 and 1943 was an error. The respondent contends that the unrecovered revenues paid into escrow by petitioner were payments to Frontier of the purchase price of the franchises; that the money represented income to the petitioner when received and the subsequent payment to Frontier should not change their character. The respondent further asserts that as capital expenditures, the amounts are not deductible by petitioner.

The tax consequences of this transaction must be determined not only by the form in which it was cast, as petitioner urges, but also by the substance of what occurred. The language of the agreement of February 4, 1941, is framed wholly in terms of purchase and sale. The payments into escrow are referred to as consideration for the

transfer of the franchises. The form, then, were we to be guided by that alone would lead us to the conclusion that these amounts were payments of purchase price, and that conclusion is made inescapable by an examination of the circumstances surrounding the transaction.

When Frontier first approached the petitioner it was interested in selling the franchises since they had proved unprofitable. The petitioner was interested in purchasing them. Then, having reached an impasse in their negotiations because of a basic disagreement as to the worth of the rights, the parties chose an arrangement of a lease to petitioner with an option to purchase. The purpose of this was to enable the petitioner to learn, through experience, what value the rights were to it. That device, then, was only a means to the desired end of complete transfer of the rights. The plan, though, was objectionable to the Interstate Commerce Commission's examiner because "the evidence * * * [was] not convincing that temporary unification through the medium of a lease would be consistent with the public interest." The report did suggest that a purchase agreement would be acceptable.

The parties then were confronted with their previous problem. It was necessary for them to agree on a purchase price or some means of ascertaining a price in order to effectuate any transfer whatsoever. It was agreed that the seller would receive payments based on operations with substantially the same method of computation of the compensation used as was used in the lease. Frontier was then to receive 50 per cent of the excess over the primary and secondary amounts instead of 25 per cent as in the lease. In addition, $3,500 was to be given to the seller upon the transfer of the rights. This, though, was to be recovered from revenues from the rights by the buyer before any payment was made into escrow. The petitioner asserts now that this was an adequate consideration for the transfer of the rights and that the other revenues paid into escrow that were to go eventually to the seller were a reservation of an interest in the rights for 5 years. It seems clear to us, however, that since the $3,500 was to be recovered by the petitioner before any further payments were to be made to Frontier, it was merely the maximum amount which was risked by the petitioner in this uncertain venture. Although it may have been an adequate consideration, it seems to have been intended that if the rights proved valuable to the petitioner, Frontier should receive consideration commensurate with their worth. The only accurate method of ascertaining the real value of the rights was to see how they proved themselves and therefore the total consideration which was to pass to Frontier was made contingent on operations under the franchises. The visitorial privileges, accountings, and the escrow arrangement were only devices used to insure compliance with the agreement and

were not, as petitioner urges, indications of a reserved economic interest of the seller. The fact that the petitioner was obligated to continue operations and retain the rights for the contract period again only indicates that Frontier was being assured of receiving a fair consideration.

We think that our conclusion does not conflict with the decisions cited by the petitioner. They, too, stand for the proposition that it is the substance of the transaction that controls its tax consequences. *Bettendorf* v. *Commissioner*, 49 F. 2d 173 (C. A. 8). The taxpayer who receives the benefits of the income should be taxed. *Central Life Assurance Society Mutual* v. *Commissioner*, 51 F. 2d 939 (C. A. 8). Here, income actually earned and received by petitioner, by operating its own buses with its own employees pursuant to its newly acquired operating rights, was being paid into escrow in discharge of the obligation which petitioner assumed in order to acquire those rights. That petitioner has thus received benefit from such income seems clear. The tax consequences should not change merely because the payments for the rights were deferred and uncertain at the time the transfer took place. The fact that subsequent earnings proved to be greater than anticipated, presumably by reason of the war, does not change the essence of the transaction. Nor should it make a difference that the payments were payable only from the revenues from the rights and that there was no personal obligation of the buyer, for as we view the transaction, it was the only method by which the parties could come to an agreement on the purchase price.

The petitioner relies heavily on cases like *Ruth W. Collins*, 14 T. C. 301, and *McCulley Ashlock*, 18 T. C. 405. These cases, however, are distinguishable from the case at bar. In each of them, the Court considered the substance of the situation and decided that the transferor reserved an interest in the transferred property. In neither of them was the situation like the one in the instant case. For, here, Frontier, the transferor, received something different from the transferred property and hence cannot be said merely to have "reserved" an interest in the franchises. The franchises were valuable only to the extent that operations under them proved successful. Frontier was unable to operate under them at a profit because of lack of proper maintenance facilities and absentee management. Frontier believed that petitioner could probably operate successfully over the routes covered by the franchises and was therefore willing to have its compensation for the transfer of the franchises conditioned on the outcome of petitioner's operations. It is clear that all the profit which petitioner earned from its operations over those routes was not attributable solely to the franchises. The many factors that enter into

making any business profitable all served to produce the earnings here. Frontier, by contracting for a part of those earnings was contracting for a part of petitioner's management, maintenance facilities, and the like, and perhaps even good will. The situation is different from those in the cases cited where the income from stock (*Bettendorf* v. *Commissioner*, *supra*), or rent due under a lease (*McCulley Ashlock*, *supra*), or part of the profits of a partnership [1] is reserved by the person transferring the particular interest.[2]

The fares collected by the petitioner in the operation of the franchises became part of its gross income at that time. It makes no difference that the petitioner had agreed to pay them into escrow so that the purchase price for the operating rights could be segregated from its other income. The status of the money for tax purposes did not change because it was agreed that it be devoted to a particular purpose. Cf. *Lucas* v. *Earl*, 281 U. S. 111. Since it does not appear otherwise in the record, we assume that the agreement was complied with and the revenues from the operation of the rights were received in the same years in which they were deposited in the escrow account. The amounts in controversy were, therefore, properly included in gross income for 1942 and 1943.

We come next to the contention of the petitioner that if the inclusion of the amounts in gross income is proper, a corresponding deduction should be allowed, since the payments into escrow were in the nature of rents or royalties. It is clear, in view of what we have said above, that these amounts represented payment of the purchase price for the franchises. They were capital expenditures and, hence, not deductible. *Chicago Stoker Corporation*, 14 T. C. 441. The determination of the Commissioner must be sustained.

*Decision will be entered for the respondent.*

---

[1] In *Ruth W. Collins*, *supra*, where 5 per cent of the profits of a partnership was reserved as part consideration for the transfer of a 25 per cent partnership interest, it was held that it was necessary for the transferee to report as her income only 20 per cent of the profits from the partnership. There, too, the income represented profits from the operations of a business, but the transfer of the partnership interest necessarily included the same elements as the interest which was reserved.

In *Central Life Assurance Society Mutual* v. *Commissioner*, 51 F. 2d 939 (C. A. 8), two types of life insurance were involved, and it seems clear from the facts that although the old company transferred both to the new, it actually sold only one of them, retaining completely the beneficial interest in the other, which, it was anticipated, would be wound up over a period of years.

[2] The petitioner also cites *Thomas* v. *Perkins*, 301 U. S. 655, and *Palmer* v. *Bender*, 287 U. S. 551, where the transferee of oil and mineral rights was obligated to pay the transferor in oil or proceeds therefrom. In such circumstances the transferee was not required to include the payments in his income, and the transferor was held to be entitled to a depletion allowance. But where the payments were not limited to payments in oil or proceeds from oil, the transferor has not been deemed to have reserved an economic interest and the opposite results occur. Cf. *Helvering* v. *Elbe Oil Land Development Co.*, 303 U. S. 372 ; *Anderson* v. *Helvering*, 310 U. S. 404 ; *Helvering* v. *O'Donnell*, 303 U. S. 370.