**HAMME et al.**
**v.**
**COMMISSIONER OF INTERNAL REVENUE.**
**No. 6689.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 19, 1953.

Decided Dec. 31, 1953.

**30**

Stanley Worth and Edward S. Smith, Washington, D. C. (Blair, Korner, Doyle & Appel, Washington, D. C., on the brief), for petitioners.

Carolyn R. Just, Sp. Asst. to the Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and A. F. Prescott, Sp. Assts. to the Atty. Gen. on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

These are appeals from judgments of the Tax Court of the United States which held net deficiencies to exist in the income tax returns of petitioners, Joseph Hamme and R. H. Hamme, for the years 1944, 1945, 1946 and 1947. The decisions were based on determinations that amounts received under a contract dated March 4, 1944, were, for federal income tax purposes, royalties from mining rights and taxable as ordinary income. Petitioners contended that the amounts received were payments of purchase price for the sale of their rights in the mining lands involved and, as such, were taxable only as capital gains.

The petitioners, brothers, while prospecting in the fall of 1942, found deposits containing tungsten in Vance County, North Carolina. They and their respective wives pooled their resources, borrowed some additional funds and obtained options on land surrounding the deposit which they had discovered. Those four persons are referred to herein at times as the Hammes. They did not have the funds or the ability to develop the property and they leased and subleased the lands to Haile Gold Mines, Inc., hereinafter referred to as Haile Mines, by a lease dated July 31, 1943. The properties covered by the lease included four tracts owned by the Hammes and one tract which they leased.

The Hammes were described in the lease as landlords and Haile Mines as tenant. The lease was to continue until April 15, 1944, unless sooner terminated, and it gave the tenant the right to take all minerals under the tracts of land covered by the lease. The rent was to be paid in monthly installments in amounts set forth in a separate agreement. This additional agreement, also dated July 31, 1943, provided that the tenant should pay the landlord 20% of the net money derived from sales of ore or concentrates during the preceding month. The tenant was also given, by joint provisions of these two agreements, an option to purchase, for a price of $10,000,000, all of the right, title and interest of the landlords to all minerals and ores in, under or upon the lands.

On March 4, 1944, the Hammes and Haile Mines entered into an agreement called an "Indenture." It provided that in consideration of the payment of $2,-000 in cash and of "royalty payments and other payments contracted to be made in the future" the Hammes "bargained and sold" property consisting of equipment and of the five tracts described in the lease of July 31, 1943, to have and to hold said leasehold, personal property and the lands above described, together with all rights, privileges and appurtenances thereunto appertaining,

unto the said party of the second part, its successors and assigns, in fee simple forever." The conveyance was made subject to the condition that Haile Mines would make payments in accordance with the terms of a contract entered into on the same date "covering royalties to be paid in the future" to the Hammes, and it provided further that in case of uncured default Haile Mines would reconvey the properties to the Hammes.

The other agreement entered into by the same parties on March 4, 1944, is entitled "Contract." It provides that in consideration "of the conveyance of a leasehold, certain personal property and certain land made by deed of even date herewith," Haile Mines agrees to pay the Hammes "in equal amounts to each of them royalties on ores, minerals, concentrates or any mineral products derived and sold from the lands or mineral rights acquired" by Haile Mines in Townsville Township, Vance County, North Carolina, "said royalties to be based on net sales or net mint or smelter returns and to be at the rate of 10% on any minerals or mineral products other than tungsten ores or concentrates, and on tungsten ores or concentrates to be at the rate of" 10%, 15% or 20%, depending upon the $WO_3$ content of the ore sold or milled as determined monthly. Royalty payments were to be made on the 20th of each month covering the sales for the preceding month. A minimum of $10,000 in royalties was to be paid in every six months regardless of sales, but the payments were to be cumulative so that any excess over $10,000 for one six months period would be carried forward as applicable to the minimum required for any subsequent period. There was to be a reconveyance of the properties to the Hammes in case of uncured default.

The combined cost to the Hammes of all of the properties conveyed by the instrument of March 4, 1944, was $33,-609.87 for which amount they were reimbursed by Haile Mines so that in 1944 the Hammes recovered their full basis for the properties conveyed.

The Hammes received royalties during the taxable years under the agreements above described from Haile Mines, or its assignee, Tungsten Mining Corporation. Those receipts for the years 1944 through 1946 were reported as royalty income on partnership returns filed in the name of Hamme Brothers on Form 1065. Those returns show the distributive shares of the petitioners and their wives in four equal amounts and each reported one-fourth as ordinary income in his or her return for each year. An amended partnership return was filed for 1946 reporting one-half of the amount received as a long-term capital gain from a sale of real estate in 1944. The individuals filed amended returns on Form 1040 accompanied by claims for refund. No partnership return was filed for 1947 but each of the Hammes filed individual returns on Form 1040 reporting one-fourth of the total receipts as a long-term capital gain of which one-half was taxable.

The Commissioner, in determining the deficiencies, reduced the receipts by 15% to represent depletion, and treated them as ordinary income for each year. The deficiencies thus determined were upheld by the Tax Court on the basis that the Hammes did not part with all that they owned but retained an economic interest in the mining properties which necessitated the income therefrom to be treated as royalties.

Petitioners contend that the specific language of the alleged indenture establishes it as a true deed and that, if there be any ambiguity discernible in this instrument, the subsequent acts of the parties inescapably confirm the intention of the parties that the agreement of March 4, 1944, constituted a sale. We can only agree that the Hammes and Haile Mines gave evidence that from the form and nomenclature of the instrument, they intended this agreement to constitute a sale.

■ It is well established, however, that the name used by the parties in describing a contract and payments thereunder, do not necessarily determine the tax consequences of their acts. West v. Commissioner, 5 Cir., 150 F.2d 723; Hogan v. Commissioner, 5 Cir., 141 F.2d 92. In the field of taxation we must be controlled by the substance and reality of a transaction rather than by the formal attributes of written documents. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226. Concerning this same problem, it was said in Palmer v. Bender, 287 U.S. 551, at pages 555, 556, 53 S.Ct. 225, at page 226, 77 L.Ed. 489: "The formal attributes of those instruments or the descriptive terminology which may be applied to them in the local law are both irrelevant."

■ Thus we cannot rely solely upon the words contained in the instruments or upon the acts of the parties thereunder to determine the tax consequences of this agreement. The Tax Court has quite properly applied to this problem the same test that is applied in determining whether depletion allowances may be taken by a taxpayer; for it is only where the taxpayer has retained an economic interest in properties or mineral rights thereon that depletion allowances are proper.

■ Section 23(m), Internal Revenue Code, 26 U.S.C.A. § 23(m), grants as a deduction:

"In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion * * * according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner * * *."

Section 114 of the Code, 26 U.S.C.A. § 114, provides the bases on which depletion is to be allowed. Section 29.23 (m)–1 of Treasury Regulations 111 provides in part that:

"Under such provisions (the provisions of Sections 23(m) and 114, Internal Revenue Code) the owner of an economic interest in mineral

deposits \* \* \* is allowed annual depletion deductions. An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place \* \* \* and secures, by any form of legal relationship, income derived from the severance and sale of the mineral \* \* \*, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit \* \* \* does not possess an economic interest merely because, through a contractual relationship to the owner, he possesses a mere economic advantage derived from production."

In 1932, the Supreme Court decisively settled the point that the retention of an oil royalty or permanent right to participate in "gross" receipts constituted an economic interest. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Bankers' Pocahontas Coal Co. v. Burnet, 287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325; Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199. In Kirby Petroleum Co. v. Commissioner, 326 U. S. 599, 66 S.Ct. 409, 90 L.Ed. 343, which involved the payment of royalties, a bonus and percentage of net profits, it was held that all these payments were subject to depletion and that the right to even "net" profits constituted an economic interest. This holding was further strengthened by Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S. Ct. 861, 90 L.Ed. 1062, which held that net profit payments, even without royalties or bonuses, were normal income and not payments on the sale price.

The attitude of the Supreme Court as to what constituted an economic interest is well reflected in these opinions. In Palmer v. Bender, it is stated at 287 U.S. pages 556, 557, 53 S. Ct. at page 226:

"But there is nothing in the statute or regulations which confines depletion allowances to those who are technically lessors. The concluding sentence of the section that

'In the case of leases the deductions allowed by this paragraph shall be equitably apportioned between the lessor and the lessee' presupposes that the deductions may be allowed in other cases. The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, *by any form of legal relationship*, income derived from the extraction of the oil, to which he must look for a return of his capital." (Italics ours.)

In the Kirby Petroleum case, it is said, 326 U.S. at page 607, 66 S.Ct. at page 412:

"In our view, the 'net profit' payments in these cases flow directly from the taxpayers' economic interest in the oil and partake of the quality of rent rather than of a sale price."

Similarly, as is pointed out by Appleman, Taxation of Sales and Assignments of Leases and other Interests in Oil and Gas, 28 Texas L.Rev. 340, 358 (1950), the basic holding of the Burton-Sutton case is that, where one who previously had an economic interest in the minerals, makes a transfer—

"a right to share in net profits is, of itself, unaccompanied by a royalty or any other economic interest, an economic interest in its own right."

Petitioners cite the cases of Helvering v. O'Donnell, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903, and Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143, as authority for holding that the transaction in question was a sale. In the Logan case, the essential question was whether a sale of stock in a corporation could have a fair market value, when part of the payments therefor was dependent upon receipts from future iron ore production of a subsidiary corporation. The case, decided in 1930, preceded the doctrines enunciated above, but it is interesting to note that, while the finality of the sale was not contested,

it nevertheless appears from the argument of Burnet, the Commissioner, 283 U.S. at page 406, 51 S.Ct. at page 551, that a statutory allowance for depletion was also made. We do not think the circumstances of the Logan case permit its applicability to the cases before us.

Similarly the O'Donnell case presented the question of the sale of shares of stock in a corporation. In holding that there was no interest in the oil and gas in place, Mr. Chief Justice Hughes stated, 303 U.S. at page 371, 58 S.Ct. at page 620:

"As a mere owner of shares in the San Gabriel Company, respondent had no such interest. * * * The ownership of the oil and gas properties was in the corporation."

And this case was clearly distinguished by Mr. Justice Reed in the Kirby Petroleum case when he said, 326 U.S. at page 606, 66 S.Ct. at page 412:

"In the O'Donnell case, the taxpayer, who received the 'net income' from an oil operation was a stranger to the lease, who had contracted for a share of its net profits as consideration for his stock in a corporation which was the owner of the lease."

Petitioners also rely heavily upon Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904, but, as noted in the court below, this case is clearly distinguishable upon the facts. There a large initial payment in excess of the cost of the properties was made, deferred payments in large amounts were payable absolutely, and there was a specific provision that the consideration other than the "net profit" payment should result in full ownership. Here the petitioners' only chance of profit lay in future production from the properties, and the properties were to be returned to the Hammes in case production ceased and there was a default.

■ Referring to the language of Section 29.23(m)–1 of Treasury Regulations 111, supra, petitioners further urge that since they have no "capital investment" they can have no economic interest. But this regulation, in delineating a "person who has no capital investment" states:

"Thus, an agreement between the owner of an economic interest and another entitling the latter to purchase the product upon production or to share in the net income derived from the interest of such owner does not convey a depletable economic interest."

Surely, these petitioners are not in the same disinterested position contemplated by that regulation, since they must have retained as much "capital investment" or economic interest as an intermediate assignor of a lease was held to have retained in Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062.

■ Finally, petitioners strenuously urge the distinction that all the cited authority which upholds the decisions below involves leases to land, while these cases involve a sale. As stated previously, the nature of this transaction may not be determined by reference only to the words and acts of the Hammes and Haile Mines. The two instruments of March 4, 1944, must be read and construed together to determine their substance and practical effect. In this regard, it is interesting to note that the contract of payment never comes to an end, and, since the mineral supply is not absolutely inexhaustible, then there is a certainty of a reverter in this "sale." Both agreements refer specifically to the payments as "royalties," and these payments bear every earmark of royalties and nothing more.

■ The minimum requirement was a minimum payment of royalties under the contract, derived from mining operations, and obviously compelled Haile Mines to exploit the minerals on penalty of default and loss of the entire property. It is clear that the impelling motive in the negotiations was the development and operation of potentially pro-

ductive tungsten properties which petitioners themselves were financially unable to develop. Under such circumstances, we can only agree with the Tax Court that the provisions of this agreement weigh heavily in favor of a leasing arrangement, West v. Commissioner, 5 Cir., 150 F.2d 723, and payments received thereunder were normal income.

The decisions of the Tax Court are, accordingly, affirmed.

Affirmed.