**VERMONT TRANSIT CO., Inc.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 5, Docket 22824.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 9, 1954.

Decided Jan. 21, 1955.

Guy M. Page, Burlington, Vt. (Charles W. Tye, Summit, N. J., on the brief), for petitioner.

Louise Foster, Sp. Asst. to Atty. Gen. (H. Brian Holland, Asst. Atty. Gen., and Ellis N. Slack, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before CLARK, Chief Judge, and SWAN and MEDINA, Circuit Judes.

CLARK, Chief Judge.

Petitioner asks review of a decision of the Tax Court of the United States, reported at 19 T.C. 1040, holding it taxable on all income earned in 1942 and 1943 from the operation of its busses pursuant to certain franchises acquired by it in 1941 from Frontier Coach Lines, Inc. It contests the interpretation given by the Commissioner and the Tax Court to the agreement of purchase and sale between it and Frontier. That agreement conveyed the franchises to petitioner outright, but provided that part of the consideration therefor should consist of earnings from the franchises in the five years following the agreement. An elaborate formula provided for the allocation of earnings for these five years, during which petitioner was bound to continue operations unless Frontier consented to abandonment, change, or alteration of routes. The earnings allocated to Frontier were to be put in escrow by petitioner, and it is the taxability of these earnings to petitioner that is here under consideration.

Whether an agreement of purchase and sale has conveyed all of the property interests involved so as to make the purchaser fully taxable on all of the resultant earnings or whether the contract has reserved an interest in the seller on which the seller is taxable is a question of the intent of the parties in making the agreement. This intent may be inferred from the wording of the agreement and from the surrounding circumstances. Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277. We agree with the conclusion of the Tax Court that the facts here point to the outright sale of a capital asset without reservation of in-

terest. The purchase agreement specified, inter alia:

"1. The Buyer agrees to buy from the Seller and the Seller agrees to sell to the Buyer the operating rights of the Seller upon routes * * * more specifically described hereinabove * * *.

"2. Seller will irrevocably transfer title to the operating rights to the Buyer on the Transfer Date * * *.

"3. The Buyer, in consideration of the transfer of the operating rights, agrees to make payments to the Seller as follows:

"(a) The Buyer agrees to pay to the Seller on the Transfer Date Three Thousand Five Hundred Dollars ($3,500) in cash.

"(b) The Buyer agrees to make payments to the Seller on the basis of the gross annual revenue from and mileage of operations by the Buyer during a period commencing on the Transfer Date and terminating five years thereafter * * *.

"7. It is understood and agreed by and between the Seller and the Buyer that, from and after the Transfer Date, the operating rights of the Seller as described in paragraph 1 of this Agreement shall be unified with the operating rights of the Buyer, and that the Buyer shall have complete jurisdiction and control over operations under these rights and shall assume complete responsibility for same."

These provisions indicate that no control was reserved in the Seller.

This reading is re-enforced by the history of the agreement. It appears that the parties for a long time disagreed as to the proper valuation to be placed on the franchises, which had not been profitable in the hands of Frontier. To solve this problem, the parties first resorted to a lease arrangement with option to buy to enable the making of a more accurate appraisal of value. Only when this expedient was disapproved by the Interstate Commerce Commission was recourse had to the Purchase Agreement now before us. It is logical to say, therefore, that the device of contingent payments was used as a way of arriving at a fair purchase price. And if the escrow payments represented purchase money they could not at the same time represent a reservation of interest in the seller. We therefore agree with the conclusion reached by Judge Raum in his carefully reasoned opinion below.

This interpretation is in accord with the reading given to a similar agreement by the Tenth Circuit in United States v. Jones, 10 Cir., 194 F.2d 783. Other cases —both those relied on by the petitioner, such as Anderson v. Helvering, supra, 310 U.S. 404, 60 S.Ct. 952; Thomas v. Perkins, supra, 301 U.S. 655, 57 S.Ct. 911; Peck v. C. I. R., 2 Cir., 77 F.2d 857, certiorari denied Peck v. Helvering, 296 U.S. 625, 56 S.Ct. 148, 80 L.Ed. 444; Central Life Assur. Soc. Mut. v. C. I. R., 8 Cir., 51 F.2d 939; Bettendorf v. C. I. R., 8 Cir., 49 F.2d 173; Shellabarger v. C. I. R., 7 Cir., 38 F.2d 566, and those cited by the Commissioner, which include Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143; Northern Trust Co. of Chicago v. United States, 7 Cir., 193 F.2d 127, certiorari denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356; and De Guire v. Higgins, 2 Cir., 159 F.2d 921, certiorari denied 331 U.S. 858, 67 S.Ct. 1752, 91 L.Ed. 1865—are sufficiently different in their facts as not to be controlling with respect to the narrow factual issue upon which this decision must turn. There is nothing in the law to which they advert inconsistent with our result here. Hamme v. C. I. R., 4 Cir., 209 F.2d 29, certiorari denied 347 U.S. 954, 74 S.Ct. 679, 98 L.Ed. 1099, does appear to suggest rather broadly that any participation in net profits constitutes a reservation of an "economic interest" for tax purposes; but the actual decision was as to the taxability of receipts from a permanent mineral royalty right reserved by a vendor.

Since the escrow payments were thus part of the purchase price for the fran-

chises, they constituted funds expended for the acquisition of a capital asset and were not a deductible business expense. See I.R.C. § 24(a) 2. Furthermore the Commissioner was correct in assessing the taxes on the income in the year in which it was earned by the taxpayer. The fact that the proper allocation of escrow payments between petitioner and Frontier under the formula was not immediately determinable was of no relevance to the taxability of these funds.

The decision of the Tax Court is affirmed.

SWAN, Circuit Judge (dissenting).

The majority opinion does not, I think, give an adequate picture of the transactions between the petitioner, hereafter referred to as the buyer, and Frontier Coach Lines, Inc., hereafter referred to as the seller. There is no dispute as to the facts. They were stipulated and were "so found" by the Tax Court. My statement of them will consist of quotations from the Tax Court's opinion.

"Frontier, which for some time had been operating at a loss, approached petitioner in 1939 in an endeavor to negotiate a sale of some of its operating rights (hereinafter also referred to as the 'rights' or 'franchises'). Such a sale appeared to be advantageous to both parties. * * * At some stage in the negotiations, Frontier indicated an asking price of $25,000 for the rights, which were valued, as intangible assets, on its books at $12,872. The petitioner insisted that the franchises had a nominal value only. Both parties desired to effectuate a purchase and sale, but they could not agree on a purchase price under the existing conditions.

"It was, therefore, agreed on August 14, 1940, that Frontier would lease the rights to petitioner until December 31, 1945, granting petitioner an option to renew the lease for an additional five years. On August 26, 1940, the parties entered into a further agreement whereby petitioner was given an option to purchase the rights at a price to be agreed upon by the parties. An arbitration procedure was provided in the event that the parties failed to agree upon a purchase price. * * * The lease was to go into effect when approved by the Interstate Commerce Commission (hereinafter called the 'Commission').

"Petitioner made application to the Commission for approval of the lease and option to buy, and a hearing was given before an examiner. The examiner submitted a proposed report recommending denial of approval of the agreement because it was thought that Frontier's predicament would only be increased if at the termination of the lease petitioner decided not to purchase the rights. The proposed denial of approval was without prejudice to the submission of an agreement pertaining to immediate purchase of the operating rights.

"No exceptions were filed to the proposed report of the examiner and a supplemental application was filed with the Commission on February 10, 1941. This application requested approval of a purchase agreement entered into on February 4, 1941, between petitioner and Frontier. The agreement referred to the parties as 'buyer' and 'seller'. The provisions of the purchase agreement were similar in many respects to the provisions of the lease. The seller was to 'irrevocably transfer' the title to the operating rights 120 days after the Commission approved and authorized such transfer. The buyer, petitioner, was to pay $3,500 to the seller when title was transferred. The primary and secondary amounts were to be computed in the same manner as in the lease agreement except that the buyer was to recover $3,500 in excess of the primary amount prior to making any deposits into the escrow account. The funds remaining in excess of the primary and secondary amounts were to be divided equally between the parties. The arrangement for payments into escrow and the disposition of the funds so deposited, as outlined above, was to be operative for a period of five years. The seller reserved the right to inspect the books of the buyer. The

seller again promised to maintain a connecting route with the buyer's routes and the buyer promised not to change or discontinue any of the acquired routes without the seller's approval. By an order dated May 4, 1941, the purchase was approved and authorized by the Commission; title to the rights was transferred on July 1, 1941; and an escrow agreement was entered into with a Burlington, Vermont, bank.

\* \* \* \* \* \*

"The amounts of $54,262.18 and $37,-347.78 represent the difference between the revenues paid into the escrow account in 1942 and 1943, and the amounts petitioner received back from escrow in those years. The petitioner asserts that it received no benefit from those funds since they were collected by petitioner for Frontier. It urges that Frontier reserved an economic interest in the operating rights and that therefore the inclusion of those amounts in gross income in 1942 and 1943 was an error. The respondent contends that the unrecovered revenues paid into escrow by petitioner were payments to Frontier of the purchase price of the franchises; that the money represented income to the petitioner when received and the subsequent payment to Frontier should not change their character. The respondent further asserts that as capital expenditures, the amounts are not deductible by petitioner."

Having thus stated the facts and the contentions of the parties, the Tax Court's opinion says: "The tax consequences of this transaction must be determined not only by the form in which it was cast, as the petitioner urged, but also by the substance of what occurred." With this statement of law I am in thorough accord. But I am unable to agree with the way in which the Tax Court and my brothers have applied it. Judge Raum says that "The language of the agreement of February 4, 1941 is framed wholly in terms of purchase and sale." I disagree. The seller agreed (1) to transfer title to the operating rights after authorization by the Commission, and (2) to maintain a connecting route with the buyer's routes. The buyer agreed (1) to pay $3,500 cash on transfer of the rights, (2) not to discontinue any of the acquired routes without the seller's consent, (3) to pay out of the operating revenue certain amounts, computed in the manner stated in the agreement, to the escrow bank for the benefit of the seller, and (4) to indemnify and hold the seller harmless for any injury to persons or property arising out of any of the operations conducted pursuant to the agreement. To treat all sums received by the seller through the escrow bank as consideration for the transfer of title seems to me to disregard both the form and the substance of the transaction. Surely some part of the consideration received must be ascribed to the seller's promise to maintain a connecting route. By the contract the buyer agreed to pay $3,500 for transfer of the rights, with the possibility of recovering it from operating earnings. It was willing to risk this amount, but it never agreed to pay anything more for the transfer of title. Instead it gave the seller a right to a defined share of the earnings, if any, for a term of five years. The escrow arrangement, the provisions for accountings, for inspection of records, for continuance of operations without abandonment or change in the routes during the contract period unless the seller should consent, and for indemnification of the seller against claims arising out of the buyer's operations, as well as the seller's promise to maintain a connecting route, all indicate to my mind that the substance of the transaction was a joint enterprise, the earnings of which were to be shared. In my opinion the agreement constitutes a reservation by the seller of the right to a specified share of the income earned by the buyer's operation of buses under the "franchises" transferred. From that share the buyer could not benefit.

The Tax Court's opinion does not dispute the rule that a transferee of property who does not acquire a right to the benefits of the income is not subject to

be taxed for that income. It denies that the seller reserved a right to a specified share of the income and it attempts to distinguish some of the cases cited by the petitioner.[1] I do not think them distinguishable in principle. In my opinion the decision of the Tax Court should be reversed.

1. Petitioner's brief cites, among other authorities, Barnes v. Alexander, 232 U.S. 117, 34 S.Ct. 276, 58 L.Ed. 530; Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Anderson v. Helvering, 310 U.S. 404, 411, 60 S.Ct. 952, 84 L.Ed. 1277; Central Life Assur. Soc. v. Commissioner, 8 Cir., 51 F.2d 939, 941; Bettendorf v. Commissioner, 8 Cir., 49 F.2d 173; Shellabarger v. Commissioner, 7 Cir., 38 F.2d 566; Commissioner v. Turney, 5 Cir., 82 F.2d 661; Hamme v. Commissioner, 4 Cir., 209 F.2d 29.