Olin **BRYANT** and Vanell Bryant et al., Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 24874.

United States Court of Appeals
Fifth Circuit.

Aug. 12, 1968.

ments to the Shipping Act of 1916 (H.R. 6775) were being considered) 107 Cong. Rec. 19343, 19344 (1961).

Edward R. Smith, Smith & Baker, Lubbock, Tex., for petitioners.

Mitchell Rogovin, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Harry Marselli, Grant W. Wiprud, Thomas L. Stapleton, Attys., Dept. of Justice, Lester R. Uretz, Chief Counsel, I.R.S., Richard P. Milloy, Atty., I.R.S., Washington, D. C., for respondent.

Before RIVES, GEWIN and THORN-BERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

This appeal from a Tax Court decision, Olin Bryant and Vanell Bryant, et al., 1966, 46 T.C. 848, raises two questions, both of which were decided in favor of the Commissioner. The first is whether the sale of a farm can be accomplished by reserving to the seller a portion of the farm's future income in such a way that part of the purchase price is paid with dollars not taxed to the purchaser; the second involves partnership treatment under the investment credit sections of the Internal Revenue Code of 1954. As to both, we affirm.

I.

On March 2, 1963, petitioners contracted with C. E. Davis to purchase from him certain farmlands, leases, and equipment collectively known as Coyanosa Farms. The stated price was $925,500, less encumbrances totaling $362,500, plus interest. In addition, the contract reserved to the seller a "production payment" to be satisfied from an undivided one-tenth of all agricultural crops, lease rentals, and water-use payments, and free from all costs, until the amount paid totaled $250,000, plus interest on the balance. The instrument provided that when the total amount had been paid "all rights, titles and interest reserved to Seller * * * shall terminate, and thereupon the one-tenth interest so reserved shall become vested in Buyers." The production payment was described as a "wholly separate and distinct property interest which may be sold, mortgaged, encumbered, or otherwise disposed of by Seller, or his transferees." The

buyers were not personally liable for the payment; the seller could look only to the crops, rentals, and other farm income. Other provisions bound the purchasers to work the farm, continue outstanding leases, pay taxes, and keep records for periodic review by the owner of the production payment.

The Tax Court found, and it is not disputed, that "the seller was only interested in receiving $1,175,500 for the Coyanosa Farms, and the 'production payment' outlined above was included in the contract at the request of the Buyers." 46 T.C. at 852. On the date of closing, the buyers were to produce a purchaser for the production payment, one ready, willing and able to purchase the interest for $250,000 cash. Should such a purchaser not be found, either party could avoid the contract. As they had no prospective purchaser at the time of signing the contract, the buyers established Clifford-type short term trusts for the benefit of their children with the Lubbock (Texas) National Bank. The corpora of the trusts consisted of $100,000 contributed by the buyers and $150,000 loaned by the bank. No security was required and repayment of the loan was to be made solely from amounts received by the trusts from farm production. At closing, Davis delivered to the buyers a warranty deed to Coyanosa Farms and to the Lubbock National Bank as trustee a "conveyance of production payment." The trusts paid Davis $250,000. During 1963, the sum of $37,399.15 due under the production payment was remitted to the bank as trustee and applied to the interest and principal of the loan. No portion of this amount was included by petitioners (the buyers) in gross income but rather was reported as income to the trusts. The Commissioner determined that each petitioner's pro rata share of the money paid to the trusts should be included in his gross income. The statutory notices of deficiency said by way of explanation that "the total consideration for the Coyanosa Farms at the time

of purchase was $1,175,000.00 instead of $925,500.00."

In sustaining the Commissioner's determination, the Tax Court held that the transactions reflected an attempt by the buyers to pay a part of the purchase price in tax-free dollars and further that the production payment did not represent any continued ownership in the farms. This Court recently affirmed a nearly identical analysis by the Tax Court in Hibler v. Commissioner of Internal Revenue, 5th Cir. 1967, 383 F.2d 989, cert. denied, 1968, 390 U.S. 949, 88 S.Ct. 1036, 19 L.Ed.2d 1138.[1] There the taxpayer had purchased the assets of a fire and casualty insurance business, paying $20,000 cash and agreeing to pay one-half of the future commission income from renewals of policies outstanding at the time of sale until the commission payments totaled $70,000. The Tax Court held the purchaser taxable on the amounts paid to the seller, calling the retained interest a security device and the commission payments assigned income.

Those familiar with oil and gas taxation will recognize the classic ABC mold in which petitioners cast their transaction. See generally Appleman, The ABC Deal, Sw. Legal Foundation 11th Inst. on Oil & Gas Law & Taxation 519 (1960). Indeed, petitioners refer us to the cases dealing with production payments reserved from sales or leases of mineral bearing lands for support of their position. Primarily, they urge that Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 is dispositive. That case involved a sale of oil and gas leases with reservation to the seller of a payment to be made annually from a percentage of the oil produced until a stated sum had been paid. The Court held that the production payment represented an economic interest in that portion of the oil which was to satisfy the payment and that income chargeable to the payment was therefore not taxable to the trans-

1. A panel of the Fifth Circuit issued a brief per curiam opinion affirming Larry D.

Hibler and Juanita Hibler, 1966, 46 T.C. 663.

feree of the leases. Besides emphasizing that the owner of a production payment has an economic interest in the oil, the Court in *Perkins* relied on Helvering v. Twin Bell Oil Syndicate, 1934, 293 U.S. 312, 55 S.Ct. 174, 79 L.Ed. 383, and Palmer v. Bender, 1933, 287 U.S. 551, 53 S. Ct. 225, 77 L.Ed. 489, where it was held that the owner of the payment rather than the owner of the leasehold is entitled to deduct depletion attributable to the payment. Taxation of income and allowance for depletion were believed to go hand-in-hand.

*Perkins* has not been applied by the Supreme Court to reserved production interests in property other than depletable minerals; in fact, on one occasion such an application was expressly rejected. In Commissioner of Internal Revenue v. Brown, 1965, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75, taxpayers had sold their stock in a closely held lumber mill to a tax-exempt charity for a cash downpayment and an interest-free note secured by mortgages. The charity liquidated the company and leased its assets to a new corporation owned by taxpayers' attorneys. The lessee corporation agreed to pay the charity eighty per cent of its gross operating profits and the charity in turn was to apply ninety per cent of these payments to the note held by taxpayers. In holding that the payments made to taxpayers by the charity were capital gains rather than ordinary income, the Court determined that taxpayers had sold their entire interest in the mill and that the payments from profits did not cause retention by the sellers of an interest in the business from which ordinary income would be derived. Two reasons were given for not applying the principle of Thomas v. Perkins: First, "the peculiar character of the business of extracting natural resources" with the allowance by Congress of depletion to compensate for ex-

haustion of the asset; second, *Perkins* "does not have unlimited sweep," being inapplicable to situations involving a mere right to payment following a completed sale. 380 U.S. at 575–576, 85 S. Ct. at 1168–1169.[2]

*Perkins* is said by petitioners to be apposite whereas the Commissioner urges that *Brown* amounts to a holding that *Perkins* is inapposite unless an economic interest has been reserved in mineral bearing property. As we read *Brown,* the incidence of taxation in this type of transaction depends on what is sold and what is retained. This seems to be the key to nearly all the decided cases. In United States v. Witte, 5th Cir. 1962, 306 F.2d 81, for example, there had been a conveyance of sand-and-gravel bearing lands with a reservation to the seller of an annual payment from the sand and gravel produced sufficient to yield one million dollars. The question was whether the proceeds from this production payment were to be taxed as ordinary income or capital gain. The argument over whether the transaction constituted a lease or sale was dismissed because it did not go to the heart of the case: "The problem was not whether there was a sale. Of course there was. The problem is *what* was sold?" 306 F.2d at 85. The Court finally concluded that all of the sand and gravel was sold except that which had been reserved by the production payment. By analogy to an oil-and-gas production payment, the retained interest was labeled an economic interest in the land conveyed. Thus,

> The proceeds, when and as received by Taxpayer, were the return of his own capital investment in a depletable mineral. Such proceeds constitute ordinary income subject to depletion.

306 F.2d at 88.

 Directing our inquiry in the instant case toward an identification of

**2.** With respect to the second distinguishing factor, the Court cited Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 and the refusal there to apply *Perkins* because the retained interest in oil payments was found equivalent to a security interest.

Davis' rights under the contract,[3] we begin with the proposition that the terms used by the parties to describe payments under the contract do not necessarily determine the tax consequences. Hamme v. Commissioner of Internal Revenue, 4th Cir. 1953, 209 F.2d 29; Staley v. Commissioner of Internal Revenue, 5th Cir. 1943, 136 F.2d 368. Although the contract stated that the purchase price for Coyanosa Farms was $925,000 and that a production payment in the amount of $250,000 was "reserved," the Tax Court found that Davis was simply concerned with receiving $1,175,000 and that the transaction was cast in the "production payment form" at the behest of petitioners. We agree that the $250,000 was in substance a part of the purchase price and that the entire interest in the farm was transferred to petitioners. Since the production payment represented part of the purchase price, it is obvious that it "could not at the same time represent a reservation of interest in the seller." Vermont Transit Co. v. Commissioner of Internal Revenue, 2d Cir. 1955, 218 F.2d 468, 470. Stated differently, the tax consequences desired by petitioners cannot be achieved in the absence of some reservation of a property interest on the part of the seller in the farm, business, or realty conveyed. Although the decisions of the Tax Court in Ruth W. Collins, 1950, 14 T.C. 301 and McCulley Ashlock, 1952, 18 T.C. 405 do not make this clear, the results are consistent with this view. Moreover, those cases are expressly limited by Vermont Transit Co., 1953, 19 T.C. 1040, aff'd, 2d Cir. 1955, 218 F.2d 468.

In Collins, taxpayer had assigned her twenty-five per cent partnership interest in a department store in return for cash and, for the rest of her life, a "sum of money equivalent to five (5%) per cent of the annual profits of the business." The payment was not from profits but merely equivalent to a percentage of profits and certain cash payments were to be substituted in the event the business was discontinued. The Tax Court held that taxpayer had "retained her beneficial interest in the five percent of the business profits, and did not transfer that when she sold her remaining rights in the firm." 14 T.C. at 305. The arrangement was the equivalent of a trust so that amounts received by taxpayer were ordinary income to her.

In McCulley Ashlock, taxpayer had purchased realty subject to an outstanding lease. He paid cash and "as a further consideration for the sale and conveyance of the property" allowed the sellers to retain possession and "all rents and income to accrue under the outstanding lease." The sellers were to pay taxes, insurance, and maintenance costs and were to give over possession of the property when the lease expired. The court held that the seller had carved out and retained an estate in the land and had transferred to the buyer only a remainder interest. Consequently, the buyer was not taxable on the rents. See also Alstores Realty Corp., 1963, 46 T.C. 363.

Vermont Transit involved a sale of bus franchise rights for fixed payments and a percentage of the profits. In holding that the profits allocated to the seller were taxable to the buyer, the court said Collins and Ashlock were distinguishable because in each "the court considered the substance of the situation and decided that the transferror reserved an interest in the transferred property." 19 T.C. at 1044. The sellers of the bus franchises, on the other hand, had completely divested themselves of ownership so that payments out of profits had to be considered part of the purchase price and taxable as income to the buyer.

As demonstrated by Vermont Transit and Commissioner of Internal Revenue v. Brown, the mere linking of future payments to the profits of the thing sold does not create a retained property interest therein. In the case

---

3. Both parties agree with the Tax Court that the subsequent conveyance by Davis to the trusts is immaterial to resolution of the issue.

*sub judice,* the owner of the production payment could look for satisfaction only to farm income, but this contingent element was offset by the fact that payments were to continue until they totaled $250,000 with interest accruing on the balance. The provision for interest on the unpaid balance strongly suggests that the parties regarded the $250,000 as an outstanding debt rather than a continuing property interest. The seller assumed very little risk. Moreover, the buyer was in complete control of the property, being obligated by the contract only to work the farm and continue outstanding leases. Taking all the facts into account, we are convinced that the so-called production payment represented only a security interest in the property sold. If our conclusion were to be different, we would have to know what it was the seller continued to own. Certainly not the crops, for they were for the most part nonexistent. Rather Davis owned a right to receive payments from income and such a right, when derived from the sale of a capital asset, gives rise to capital gains. On the other side of the coin, the new owner of the property derived a benefit from all the income, including that later remitted to the seller, because with that income he purchased an asset. The profits from the property were ordinary income to him. See Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Higgins v. Smith, 1940, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406.

■ To state the negative of what we have been saying, when future payments are linked to profits from the thing sold but do not represent a part of the purchase price, the ultimate recipient will not be able to treat them as capital gains. This was the situation in Moberg v. Commisioner of Internal Revenue, 5th Cir. 1966, 365 F.2d 337, where owners of Dairy Queen franchises granted subfranchises under contracts providing for fixed installment payments and, "in the nature of a royalty", payments related to the amount of mix used in the operation of the franchise. These gallonage payments were to continue long after the franchise expired and so long as no one else used the same freezer in the territory granted or, in some cases, so long as the subfranchisee used the freezer. The issue was whether the sellers of the subfranchises should treat these gallonage payments as ordinary income or capital gain. This Court affirmed the decision of the Tax Court that the payments were not proceeds from the sale of capital assets but rather were "the yield of a retained interest in the earnings of the subfranchises." 365 F.2d at 339. This conclusion was based on (1) the intent of the parties, for they described the payments as "royalty" and taxpayers reported them as ordinary income in their original returns, and (2) the duration of the payments:

> The longer the payments are spread out (here, for as long as the freezers are used or for as long as no one else used the freezers in the assigned territory), the more the payments resemble a continuing interest in the earning capacity of the business transferred, * * *

365 F.2d at 340.[4]

We cite three factors which have helped us make what is essentially a factual determination. Where the production payment is limited to a specific amount and where this amount is included in the total figure which the seller expects to receive and the purchaser expects to pay, it is likely, if not conclusive, that the future payments are part of the purchase price. As we have said, once they are so characterized, it necessarily follows that all the property has been sold. A second factor is the duration of the payments: If limited to a short term and a sum certain, they are

---

4. See Willard S. Heminway and Anabel P. Heminway, 1965, 44 T.C. 96, where stock was sold with the right to dividends retained by the seller for life. The owner of the stock was held not liable for taxes on the dividends because he was no more than agent or trustee for the seller.

less likely to be deemed attributable to continued ownership by the seller. Finally, when interest is to accrue on the unpaid balance of the total sum, it would seem that the entire amount is a debt from the time of the sale and that the periodic payments are simply made in reduction of that debt. We stress this interest factor, for we consider it a sure sign that the parties in this case intended to complete a sale of the entire property for $1,175,000.

■ What we are holding, and the idea is not new, is that the "economic interest" concept and the depletable mineral cases cannot be mechanically applied to other situations. See Moberg v. Commissioner of Internal Revenue, supra, 365 F.2d at 340–341 (Brown, J. concurring). A taxpayer does not have an economic interest in property merely because his right to payments is linked to profits, dividends, farm produce, or the like. The question in all cases is what is owned by whom, or more exactly, what is the source of the right pursuant to which payments are received. If received for that which has been sold, they are taxable income to the purchaser; if received for that which is retained, they are ordinary income to the ultimate recipient and excludable by the conduit or person transferring them. Since we are in agreement with the Tax Court that Davis' right to receive a portion of the farm income, which right he sold to the trusts, derived from sale rather than retained interest, petitioners are taxable on that portion of the income.

## II.

■ On March 1, 1963, the buyers of Coyanosa Farms entered into an "Operators Agreement" which provided that Dallas Smith would be in charge of operating the farm. The agreement outlined the general duties of the operator and the rights of the non-operating owners. See 46 T.C. at 854. For the calendar year 1963, the buyers filed a partnership return in which they made an election pursuant to Section 761(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 761(a), to be excluded from the application of the provisions of Subchapter K (26 U.S.C. §§ 701–771, Partners and Partnerships). In its notices of deficiencies, the Commissioner determined that in computing investment credit for used qualified assets purchased with Coyanosa Farms, each buyer was limited to his proportionate share of the $50,000 limitation provided by section 48(c) (2). The effect of this ruling was to treat the buyers as a partnership under section 48(c) (2) (D). The issue presented is the basic one of whether an election to avoid partnership treatment under Subchapter K likewise avoids partnership treatment under the investment credit sections of the Code. There is no case authority and the legislative history is of little help. With only the language of the statute to guide us, we are constrained to agree with the Tax Court and the Commissioner.

The wording of section 761(a) leaves little doubt as to the scope of the election there provided: " * * * the Secretary or his delegate may, at the election of all the members of an unincorporated organization, *exclude such organization from the application of all or part of this subchapter * * *.*" (Emphasis added). There is no congressional authority for exclusion from the application of other Code sections relative to partnerships. Section 7701 defines a partnership to include a "group, pool, joint venture, or other unincorporated organization," which operates for profit and is not a trust, estate, or corporation. Section 48(c) (2) (D) makes applicable to a partnership in the aggregate the $50,000 investment-credit limitation. We believe that the buyers here were in partnership and therefore that they could not avoid the investment-credit limitation by an election to avoid Subchapter K. We adopt as our own the statement of the Tax Court that

[i]f we were to accept the argument advanced by petitioners, we would necessarily extend the Commissioner's power of exclusion to other sections of the Code outside subchapter K.

This we are unwilling to do because it would not be within the spirit or intendment of the statute as enacted by Congress. In our opinion sections 761(a) and 48(c) (2) (D) are not interdependent. When Congress has subtitled, subchapterized, and sectionized its treatment of a many threaded statutory pattern like the complex Internal Revenue Code, its clear words seem to us a safe guide to meaning. The election under section 761(a) does not operate to change the nature of the entity. A partnership remains a partnership; the exclusion simply prevents the application of subchapter K. The partnership remains intact and other sections of the Code are applicable as if no exclusion existed.

46 T.C. at 864.

Affirmed.