LARRY D. HIBLER AND JUANITA HIBLER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2338–65. Filed August 23, 1966.

*Edward R. Smith* and *William Norton Baker*, for the petitioners.
*Sidney B. Williams*, for the respondent.

OPINION

DAWSON, *Judge:* Respondent determined a deficiency in income tax against petitioners for the years 1962 and 1963 in the amounts of $1,263.84 and $2,065.92, respectively.

The issues for decision are whether amounts paid as "commissions" by petitioner Larry D. Hibler to G. O. Walker, pursuant to an agreement for the purchase of certain properties of the Walker Insurance Agency, are includable in petitioner's gross income and, if so, whether they are deductible as ordinary and necessary business expenses.

All of the facts have been stipulated and are adopted as our findings.

Larry D. Hibler (hereafter called petitioner) and Juanita Hibler are husband and wife who reside in Lubbock, Tex. They filed their Federal joint income tax returns for 1962 and 1963 with the district director of internal revenue at Dallas, Tex. Juanita Hibler is a party to this proceeding only because she signed the joint returns.

On January 24, 1962, petitioner purchased certain properties from G. O. Walker which had been used by Walker in the operation of the G. O. Walker & Co. Insurance Agency. Relevant portions of the bill of sale are as follows:

THAT I, G. O. Walker, of the County of Lubbock, State of Texas, for and in consideration of the sum of Twenty Thousand and No/100 ($20,000) Dollars, cash, to me in hand paid by Larry D. Hibler, of Lubbock County, Texas, receipt of which is hereby acknowledged, have bargained, sold and delivered, and by these presents do bargain, sell and deliver unto the said Larry D. Hibler the following described personal property situated in Lubbock County, Texas, to-wit:

(1) All furniture, fixtures and equipment located in the insurance agency heretofore operated under the name of G. O. Walker & Company in the City of Lubbock, Lubbock County, Texas.

(2) All records and expirations of insurance of G. O. Walker & Company as of February 1, 1962.

It is specifically understood and agreed that this sale does not include the right to operate the above described agency under the name of G. O. Walker & Company, does not include the accounts receivable and notes belonging to the undersigned, and does not include any automotive equipment. It is further specifically

understood and agreed that the above named purchaser does not assume or agree to pay any of the debts owing by the said agency or by the undersigned.

There is reserved by the undersigned, G. O. Walker, the right to receive fifty per cent (50%) of the commissions paid to the above named purchaser, his heirs or assigns, by reason of coverage issued in renewal of business reflected on the books of G. O. Walker & Company as of February 1, 1962, until fifty per cent (50%) of such renewal commissions shall have totaled the sum of Seventy Thousand and No/100 ($70,000.00) Dollars, at which time all interest of the said G. O. Walker, his heirs or assigns, in such renewal commissions shall terminate. In connection with this provision, any policies or bonds which have already been issued but which become effective after February 1, 1962 shall be considered new business or renewal business, depending upon whether or not such policies or bonds were issued in renewal of coverage which was in effect on said date.

Simultaneous with this purchase, the petitioner, G. O. Walker and Standard Accident Insurance Co. entered into an agreement pertaining to the payment of policy renewal commissions and meeting the $70,000 maximum obligation in the event of a sale of part of the agency or a breach of obligation by petitioner. This agreement provides, in pertinent part, as follows:

WHEREAS, Walker has this day sold and conveyed to Hibler certain assets pertaining to the business heretofore operated by Walker under the name of G. O. Walker & Company, and there was reserved from said sale fifty percent (50%) of the commissions to be paid on insurance policies and bonds issued in renewal of business reflected on the books of G. O. Walker & Company as of February 1, 1962, until the proceeds of the reserved interest total $70,000.00; and

\* \* \* \* \* \* \*

1.

Hibler shall pay, promptly after the first of each month, to Standard Accident Insurance Company, fifty percent (50%) of the commissions received by him on all business written in renewal of business reflected by the books of G. O. Walker & Company on February 1, 1962. Standard shall, promptly upon receipt of such payment, remit forty percent (40%) of such payment to Walker and apply the other sixty percent (60%) of such payment to the reduction of Walker's indebtedness to it.

2.

Hibler agrees that in receiving the renewal commissions he will act as trustee for Walker to the extent of fifty percent (50%) thereof, and will remit Walker's share as promptly as possible to Standard, and Standard's receipt for such payment, or endorsement on Hibler's check, shall be fully binding on Walker and shall protect Hibler from any claim on the part of Walker for the amount of such payment.

3.

Hibler agrees that he will exercise reasonable diligence to renew the business reflected on the books of G. O. Walker & Company as of February 1, 1962, and will use all reasonable efforts to prevent the loss of such business and will diligently and in good faith service said accounts, to the end that the interest in said renewal commissions reserved by Walker shall, as promptly as possible, total the said sum of $70,000.00.

\* \* \* \* \* \* \*

**5.**

Hibler shall not sell all or a material part of the insurance agency which he proposes to conduct, nor will he deliver possession of the records or expirations thereof to any other party, without the written consent of Walker, his executors, heirs or administrators, and of Standard. This provision shall be construed as prohibiting any transfer of any nature involving a substantial part of the furniture, fixtures and equipment sold by Walker to Hibler, as well as any transaction involving the transfer of possession of the books, records and expirations of the agency to be conducted by Hibler, without the consent aforesaid.

**6.**

If Hibler should default in the performance of any obligation resting upon him hereunder, and such default should continue for five (5) days after notice thereof has been served upon Hibler by Walker or by Standard, either Walker or Standard shall be entitled to take immediate possession of the records and expirations of the agency being operated by Hibler, and of the furniture, fixtures and equipment aforesaid, and either of said parties may thereupon sell such books, records and expirations, furniture, fixtures and equipment, to any purchaser, upon any price and terms which they, or either of them, may deem advisable, and apply the proceeds of such sale to the retirement of any unpaid balance of the seventy thousand dollar interest in said renewals reserved by Walker in the proportions of 60% to Standard and 40% to Walker, and if the proceeds of such sale should exceed the amount necessary to accomplish said purpose, such excess proceeds shall be returned to Hibler.

**7.**

Nothing herein contained shall be construed as imposing upon Hibler any liability to pay said sum of $70,000.00 ; the obligation of Hibler with respect thereto is limited to the obligation to exercise the diligence aforesaid in connection with the collection and receipt of the above mentioned renewal commissions and to remit the proceeds of the interest reserved by Walker as herein provided.

**8.**

When and if Walker's indebtedness to Standard shall have been paid, either out of the aforesaid portion of the interest in renewal commissions reserved by Walker or otherwise, Standard shall reassign to Walker, his heirs or assigns, the remaining balance of such reserved interest and shall promptly notify Hibler of such reassignment.

Both agreements were prepared by an attorney for Standard Accident Insurance Co. He billed his services to that company. Petitioner paid no part of his fee and was not represented in the transaction by any attorney.

Of the $20,000 paid at the time of sale, petitioner allocated $10,000 to furniture, fixtures, equipment, and other depreciable assets. The remainder was allocated to an account styled "Prepaid Commissions" which petitioner amortized, although half of it was later disallowed by respondent.

G. O. Walker & Co. dealt exclusively in fire, casualty, and fidelity insurance. Unlike life insurance, these types of insurance policies are not "automatically renewed" and must be solicited again after a certain

period of time. G. O. Walker & Co. had gross premium income of $196,433.82 for 1959, $213,598.28 in 1960, and $203,044.18 in 1961. It is the insurance expirations on these policies which were transferred to petitioner.

The following is a schedule of the commissions on policy renewals paid on Walker's behalf, pursuant to these agreements, during the years 1962 through 1965, as well as a summary of gross premium income received by the Larry D. Hibler Agency on the renewal of these expirations:

| Year | 50 percent commissions | Gross premium income |
|------|------------------------|----------------------|
| 1962 | $6,196.49 | $62,604.45 |
| 1963 | 5,226.50 | 58,020.08 |
| 1964 | 4,292.22 | 39,991.05 |
| 1965 | 4,015.81 | 43,521.17 |

The amounts of $6,196.49 and $5,226.50 for the years 1962 and 1963, respectively, paid by petitioner on Walker's behalf, were reported as taxable income in such years by petitioner. He then deducted them as commission expenses. The effect of such inclusion and offsetting deduction was to leave taxable income as if such amounts had neither been reported as income nor deducted as expense.

Respondent disallowed the deductions claimed for the payments made to Walker in 1962 and 1963 with the following explanation:

(c) It is determined that the amount * * * claimed as a deduction for commissions paid expenses constitutes a capital expenditure for the purchase of intangible assets which have an indeterminate life rather than an ordinary and necessary business expense and the amount * * * is therefore disallowed.

Petitioner concedes that if respondent correctly determined that the amounts paid on behalf of G. O. Walker constitute expenditures for capital assets, then no part of those expenditures is amortizable or deductible.

In addition to respondent's determination with respect to the amounts of $6,196.49 and $5,226.50 paid Walker in 1962 and 1963, the respondent also disallowed $885.20 and $746.60 of the commission expense deduction claimed for the years 1962 and 1963. Pursuant to an agreement reached by the parties, petitioners are entitled to deductions for 50 percent of the latter amount, i.e., $442.60 for 1962 and $373.30 for 1963.

Petitioner contends that the amounts in question belonged to Walker and therefore were not income to him. He points to the language of the agreement and emphasizes that because it was written by Walker's assignee it reflects the seller's intent. He argues that Walker reserved an income interest in the policy renewal commissions and was the person who received the beneficial interest from the commissions since petitioner was under a legal obligation to pay them to him.

From this he maintains that such amounts were income only to Walker and that petitioner was merely trustee for him when he received and distributed them.

The countervailing contention of respondent is that amounts paid to Walker out of commissions constitute part of the purchase price of a capital asset, viz, the expiration lists, having an indeterminate useful life and, consequently, are not deductible expenditures. Respondent claims that the commissions paid to Walker were petitioner's income because they were earned through his efforts and because the benefits of such income inured to him.

The parties agree that there was a sale, but disagree as to what was sold. They are also in agreement that economic substance prevails over form, *Higgins* v. *Smith*, 308 U.S. 473 (1940), and that tax consequences are not determined solely by the mechanical means used to transfer legal title to property, *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945). It is settled, too, that customer lists of fire and casualty insurance constitute capital assets for tax purposes. *Commissioner* v. *Killian*, 314 F. 2d 852 (C.A. 5, 1963); and *George J. Aitken*, 35 T.C. 227, 229 (1961).

As we view it, there was a sale to petitioner of all ownership in the insurance expirations when the agreements were executed. The plain language of the agreements shows that a complete transfer of the insurance expirations was intended. The bill of sale states that Walker "bargained, sold and delivered" to petitioner "all records and expirations of insurance of G. O. Walker & Company as of February 1, 1962." There is no mention of expirations in the list of items being withheld from the sale. Walker did reserve a right to be paid "commissions" to be earned by petitioner. However, petitioner bore all the risks and burdens of ownership from the date of sale. See *Mc-Culley Ashlock*, 18 T.C. 405, 411 (1952); *Alstores Realty Corp.*, 46 T.C. 363 (1966). See also *2 Lexington Avenue Corp.*, 26 T.C. 816 (1956), where this Court held that rents which accrued between the contract date and the closing date remained taxable to the seller of the property despite the fact that the buyer's purchase price was credited with the amount of the rents. Citing *Helvering* v. *Horst*, 311 U.S. 112 (1940), we said that the rents were "earned" by the seller during such period because the greater bundle of rights and incidents of ownership remained with him.

It is true that petitioner was obligated to service the renewal accounts; that he could not deliver possession of the expirations to another party without the consent of Walker and his assignee; and that, in case of default, Walker was entitled to immediate possession of the expirations, including the right to sell them and apply the proceeds to the "unpaid balance of the seventy thousand dollar interest in said renewals." But, except for his right to receive 50 percent of the "commissions" earned on the expiration renewals, what

Walker actually had was a security interest. His status was that of a creditor with protection for an outstanding obligation, and not that of an owner of an economic interest in the property sold.

It is well established that income is taxed to the one who earns it or otherwise creates the right to receive it and to enjoy the benefits of it when paid. Moreover, income arising from property is taxable to the owner thereof. *Lucas* v. *Earl*, 281 U.S. 111 (1930); *Helvering* v. *Horst, supra;* and *Helvering* v. *Eubank*, 311 U.S. 122 (1940), involving commissions on life insurance policy renewals. Since policies of fire, casualty, and fidelity insurance, unlike life insurance, are not automatically renewed, and since Walker withdrew from active participation as an insurance agent at the date of sale, the petitioner became solely responsible for operating the business and generating income from renewals. It was he who had the control and benefits of ownership in the expiration lists. It was he who had to resell the insurance to former customers of Walker when the policies expired before there were any commissions. In terms of both labor expended and property owned, it was he who earned *all* the commission income.

Petitioner's objective in entering into the agreements was to acquire the benefit of the established insurance business of Walker. In substance, as we view the situation, petitioner paid Walker $20,000 cash for the insurance business at once, and obligated himself to make additional payments out of renewal commissions up to a maximum of $70,000 depending on how profitable the renewal business might turn out to be. That such was the intent of the parties is confirmed, in part, by the provision in paragraph 6 of the agreement that upon default in making these payments Walker would be entitled to take "immediate possession of the records and expirations," sell them, and apply the proceeds of sale to the unpaid balance of $70,000.

We think this case falls within the ambit and rationale of our opinion in *Vermont Transit Co.*, 19 T.C. 1040 (1953), affd. 218 F. 2d 468 (C.A. 2, 1955), certiorari denied 349 U.S. 945 (1955). In that case the buyer and seller were unable to agree upon the value of a bus franchise. In consideration of the transfer of the franchise, the buyer agreed to and did pay the seller $3,500 and a percentage of the net income above operating costs. Rejecting the buyer's contention that the seller had reserved and retained a percentage interest in the net income, we concluded that the payment of a percentage of net income was simply a convenient method of setting the purchase price for the franchise and that since such net income represented the purchase price of the franchise, it was taxable to the buyer. In so holding, we said (19 T.C. at 1044–1045):

Here, income actually earned and received by petitioner, by operating its own buses with its own employees pursuant to its newly acquired operating rights, was being paid into escrow in discharge of the obligation which petitioner assumed

in order to acquire those rights. That petitioner has thus received benefit from such income seems clear. The tax consequences should not change merely because the payments for the rights were deferred and uncertain at the time the transfer took place. * * *

* * * The many factors that enter into making any business profitable all served to produce the earnings here. Frontier, by contracting for a part of those earnings was contracting for a part of petitioner's management, maintenance facilities, and the like, and perhaps even good will. * * *

The fares collected by the petitioner in the operation of the franchises became part of its gross income at that time. It makes no difference that the petitioner had agreed to pay them into escrow so that the purchase price for the operating rights could be segregated from its other income. The status of the money for tax purposes did not change because it was agreed that it be devoted to a particular purpose. Cf. *Lucas* v. *Earl*, 281 U.S. 111.

We have carefully considered the many cases cited by petitioner relating to the general rule that a seller may reserve income in property sold. But we believe all of them are either factually or legally distinguishable from the instant case. Where post-sale income is applied against the purchase price, the courts have had to decide, on the facts of each case, whether the seller reserved to himself and retained post-sale income. With such reservation and retention, the seller has been held taxable. Without such reservation and retention, the buyer has been held taxable on the theory that such income was either actually or constructively received by the buyer and applied against the purchase price. Sometimes the line of demarcation between the decided cases has been exceedingly thin or shadowy, and no single factor has been used by the courts in reaching their determinations. No doubt an inordinate amount of judicial time has been devoted to solving the problems arising from "reservation of income" cases in an effort to reach a general consensus of what the law is, not to mention what it ought to be. However, out of the decisional law there have evolved some seemingly conflicting views which are difficult to reconcile.

Cases like *Thomas* v. *Perkins*, 301 U.S. 655 (1937), and *United States* v. *Witte*, 306 F. 2d 81 (C.A. 5, 1962), involving reserved economic interests in oil, gas, sand, or gravel, are disparate and reliance on them is misplaced. They deal with depletable natural resources. They do not have "unlimited sweep" and their applicability has been severely limited by the Supreme Court. See *Commissioner* v. *Brown*, 380 U.S. 563, 575–576 (1965), and *Anderson* v. *Helvering*, 310 U.S. 404, 413 (1940). Therefore, we are unwilling to extend their rationale to cover an attempted reservation of a specified amount of future income earned by this petitioner in selling fire and casualty insurance renewals.

*McCulley Ashlock*, *supra*, involved the sale of realty subject to an existing lease, the rentals from which were payable to the seller in diminution of the purchase price. We held the seller taxable on the

rent from the lease because he had carved out his interest in the post-sale income from the fee and had sold the remainder of the fee to the buyer. The factors which indicated the seller's retention of control and ownership of an interest were: (1) The seller was to pay during the term of the lease all property taxes, including insurance premiums, and all normal maintenance expenses; (2) he was to bear all losses in the event of temporary damage or destruction to the building; (3) in case of complete destruction of the building the buyer had the option to rebuild or pay the seller for the unpaid rent; and (4) no debtor-creditor relationship was created. In *Ashlock* the seller expressly reserved the right to possession and control during the period he was to receive the rents and thus had beneficial ownership during such period. By contrast, the petitioner in this case had possession and control of the business when the fire and casualty insurance renewal commissions were earned and a percentage of them paid over to Walker. Thus the *Ashlock* opinion supports, rather than denigrates, our conclusion here. Cf. *Alstores Realty Corp.*, *supra*.

*Ruth W. Collins*, 14 T.C. 301 (1950), and *Central Life Assur. Soc. Mut.* v. *Commissioner*, 51 F. 2d 939 (C.A. 8, 1931), are distinguishable for the same reasons set forth in *Vermont Transit Co.*, *supra*. Furthermore, it is clear from the facts in *Collins* that the seller continued to work regularly in the department store after selling her interest in the business to her son; hence, her efforts helped in some degree to produce the business income and she did have a beneficial interest therein. That is quite different from what happened in this case. Walker did nothing after the sale was consummated. There would have been no post-sale income if petitioner had not contacted Walker's former customers and written the new contracts for the fire and casualty insurance.

Neither has the petitioner established that the payments here involved were made pursuant to an arrangement sometimes entered into by professional men to share fees received from clients referred to one by another. Cf. *Mark D. Eagleton*, 35 B.T.A. 551 (1937), affirmed on other issues 97 F. 2d 62 (C.A. 8, 1938). Nor do we consider apposite our decisions in *May T. Hrobon*, 41 T.C. 476 (1964), where the taxpayer transferred to her former husband all her right, title, and interest in a trust life estate, but by the agreement retained 60 percent of the net distributions of the trust for herself; and *Willard S. Hemingway*, 44 T.C. 96 (1965), where the seller retained a life interest in dividends to be paid by a company with respect to stock she sold to her brother. While *Fellows Sales Co.* v. *United States*, 200 F. Supp. 347 (D.S.Dak. 1961), is admittedly close to this case in some respects, we are neither controlled by it nor inclined to follow it under these particular circumstances.

To our way of thinking, in a post-sale income situation such as we have before us here, the buyer should be held taxable when he controls the property, earns future income from it by his own efforts and then uses such income to pay for his purchase.

Alternative to his "reservation of an interest" position, petitioner contends that he acted as a trustee for Walker in receiving the commissions. Paragraph 2 of the agreement between petitioner, Walker, and Standard Accident Insurance Co. provides that "Hibler agrees that in receiving the renewal commissions he will act as trustee for Walker to the extent of fifty percent (50%) thereof, and will remit Walker's share as promptly as possible to Standard." Petitioner then cites Texas statutes and cases to show that when an express trust is created the one who receives income in his capacity as trustee for another is not taxed on such income. We agree with these propositions. However, in view of what we have said above, the petitioner, not Walker, earned the commissions and the amounts later paid to Walker represented payment on the purchase price of the expiration lists. As such, the amounts paid were capital expenditures and, therefore, not deductible. *Vermont Transit Co., supra* at 1045. Petitioner was only obligated by the sales agreement to pay over to Walker a percentage of commission income earned and received by petitioner on the renewals from Walker's former customers. He was not Walker's trustee or agent in earning such income.

Accordingly, we hold for the respondent, but to reflect the concessions made by the parties in paragraph 5 of the stipulation of facts and the conclusions reached herein with respect to the disputed issues,

*Decision will be entered under Rule 50.*