## VICTOR E. AND HELEN A. STROMSTED, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3187–67.    Filed November 26, 1969.

*John Potts Barnes*, for the petitioners.
*Stephen M. Miller*, for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income taxes for the following years:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1962 | $5,976.68 | 1964 | $4,235.58 |
| 1963 | 7,884.81 | 1965 | 3,607.20 |

The deficiencies determined for the years 1962, 1963, and 1964 were, in part, attributable to the disallowance of certain depreciation deductions taken by petitioner in each of these years. Petitioner has not contested the propriety of respondent's action relating to these items and we, therefore, regard the adjustments in income arising therefrom as having been conceded by petitioner.

The primary issue remaining for our determination is whether certain payments, made by petitioner to the three parties in interest who preceded him as Dale Carnegie sponsors in the franchise territories pertinent to this case, constituted a continued income interest retained by these parties and taxable to them or income earned by the petitioner and taxable to him. If we hold for respondent on this issue, we must then determine whether these payments were amortizable under section 167.

FINDINGS OF FACT

Some of the facts were stipulated by the parties. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Victor E. Stromsted (hereinafter Stromsted or petitioner) and Helen A. Stromsted are husband and wife and were residents of DeWitt, N.Y., at the time the petition herein was filed. Stromsted and his wife filed a joint income tax return for the calendar year 1962 with the district director of internal revenue, Syracuse, N.Y. For the calendar years 1963, 1964, and 1965, petitioners filed joint income tax returns with the district director of internal revenue, Buffalo, N.Y.

Dale Carnegie & Associates, Inc., whose corporate name was formerly Dale Carnegie Publishers, Inc. (hereinafter Dale), is a corporation organized and existing under the laws of the State of New York. Dale is engaged in the business of licensing persons (designated sponsors) in specified territories to promote, offer, organize, and conduct in their respective territories classes in the several courses of instruction created and prepared by Dale; the principal courses being the Dale Carnegie Course in Effective Speaking and Human Relations, the Dale Carnegie Sales Course, and the Dorothy Carnegie Course in Personal Development for Women.

Stromsted was for all years herein pertinent a licensee (sponsor) of Dale. As such he was licensed to promote, offer, organize, and conduct in specified territories in the State of New York, comprising 34 counties, classes in the Dale Carnegie Course in Effective Speaking and Human Relations, the Dale Carnegie Sales Course, and the Dorothy Carnegie Course in Personal Development for Women.

Helen A. Stromsted is a party to the case only by virtue of the fact that she filed joint returns with her husband for the years in question. Reference, therefore, to the petitioner will at all times hereinafter be restricted to the petitioner Victor E. Stromsted.

Dale courses are taught throughout the United States and in many countries in the free world. The most valuable asset in Dale's business is the Dale Carnegie name. Dale has always exercised the utmost care in making sure that its reputation will not be injured by the persons to whom it grants franchise licenses. Moreover, since the continued financial success of any given franchise territory is directly proportional to the efforts of the Dale licensee in that territory, Dale has always sought to keep a tight grip on its sponsors. Were Dale to lose control of an unimaginative sponsor who had failed to live up to Dale's expectations, not only might tuitions in the territory decline, but if the sponsor were irresponsible as well, Dale's reputation in the sponsor's territory might be permanently harmed. To cope with this, Dale

has customarily granted franchises for a very short initial term, usually 3 years. The 3-year basic period is then automatically renewable for successive 12-month periods. However, the right to stop the running of the initial renewal period or any renewal period thereafter is expressly reserved to either party on the condition that the party wishing to terminate give 6 months' notice before the renewal date to the other. In this way, Dale is able to limit its commitment to a given sponsor for what it believes to be the shortest reasonable period of time.

Historically, because of the unfettered power of termination which Dale reserved in each franchise agreement, when a person became a Dale sponsor, he had no assurance that his license would last beyond the initial license period. Even if his license was renewed, he had no assurance that it would extend beyond the 12-month renewal period since Dale could terminate for any reason as long as it complied with the 6-month-notice requirement.

Once the license was terminated, the sponsor was left without a business. No longer could he use the Dale name or obtain Dale material. Additionally, the terms of the terminated license agreement even forbade him from thereafter referring to his former relationship with Dale. He had no salable business assets. Nor were his student rosters worth anything since, statistically, a Dale student rarely repeats a course he has already taken with Dale. In short, a person in the position of a sponsor whose license had been terminated had little to show for his past efforts.

Recognizing the possible inequities inherent in its policies, Dale, as far back as 1957, sought to provide its sponsors with some protection against the day when Dale might opt to terminate the license agreement. It was felt that, in the absence of fraud, deceit, or dishonesty, a sponsor should have something to represent his years of service put into the franchise territory. Accordingly, Dale established a policy of providing an outgoing sponsor with periodic payments which were to last for a maximum of 10 years. In the great majority of cases these payments were uniformly set at 6 percent of the gross tuitions received by the successor sponsor from the territory in question with a ceiling equal to five times the amount of the average annual license fees paid by the outgoing sponsor to Dale during the 36 months preceding the termination of his license.[1]

Prior to September 1, 1961, Dale implemented this policy by requiring that each successor sponsor make annual payments to his predecessor in the amount and for the time period prescribed by the uniform formula described above. Moreover, since it had always been Dale's practice to require a successor sponsor to sign a new Dale license

---

[1] The license fee paid to Dale was normally 12 percent of gross tuitions received.

agreement, Dale was able to secure the promise of the successor sponsor with little difficulty—Dale regarding the promise of the new sponsor as a condition precedent to the signing of a new license agreement. Dale's practice of requiring a new license agreement between it and each new sponsor was rigidly enforced, even where the new sponsor had already obtained, with Dale's knowledge and consent, an assignment of the old license from the outgoing sponsor.[2]

Since September 1, 1961, when a new form contract was first put into effect, Dale has formalized its policy of making payments to outgoing sponsors by providing that, in the absence of fraud, deceit, or dishonesty, an outgoing sponsor could assign his license to the Dale Carnegie Service Corp. (hereinafter sometimes Intermediary) and thereby become entitled to the 10-year income interest prescribed by the uniform formula which was also incorporated in the new form agreement. Intermediary, the majority stockholders of which were also the majority stockholders of Dale, would then presumably pass this obligation on to the new sponsor in much the same manner as that employed by Dale.

Although an outgoing sponsor may nominate his successor, he may not assign his license to anyone without first obtaining Dale's consent.[3] In practice Dale has rejected successor sponsors suggested by outgoing sponsors, selecting instead persons who normally are a part of Dale's "Crown Prince" program, i.e., persons who have worked for other sponsors and who have been recommended to Dale because their respective sponsors considered them to be exceptionally well qualified for the responsibilities of a sponsorship position.

Petitioner, prior to becoming a Dale sponsor, had worked as area manager of a Dale franchise in the Kansas City, Mo., area. As a result of his activities in Missouri, petitioner became well known to a John Cooper (hereinafter Cooper), executive vice president and general manager of Dale. It was on Cooper's recommendation that petitioner was chosen as successor sponsor for the franchises described in the several assignments and license agreements discussed below. None of the sponsors succeeded by petitioner had any voice in the selection of the petitioner as successor to them in their respective franchise territories.

Prior to July 14, 1960, Edward J. Michel and Charlotte D. Michel (hereinafter the Michels) were the Dale sponsors in 24 counties in New York State, including 23 counties of petitioner's present territory.

[2] In practice, the assignment does not bind Dale since, in addition to Dale's approval, the terms of the assignment are normally predicated on Dale's entering into a new license agreement with the successor sponsor. In effect, the only purpose served by the assignment is to bind the successor to make the prescribed continued income payments to the outgoing sponsor in the event that Dale and the new sponsor enter into a license agreement for the territory previously worked by the outgoing sponsor.

[3] See fn. 2, supra.

On June 6, 1960, the Michels entered into an agreement with petitioner, the pertinent terms of which were as follows:

## AGREEMENT

WHEREAS, for the consideration hereinafter recited and upon the terms and conditions hereinafter set forth, the parties wish that an agreement be made whereby First Parties sell to Second Party the license or franchise hereinbefore referred to.

       *       *       *       *       *       *       *

First Parties do hereby agree to sell unto Second Party, to be effective July 14, 1960, First Parties' said license or franchise * * *.

Second Party hereby agrees to pay to First Parties within ten years from July 14, 1960, the sum of Sixty-three thousand Dollars ($63,000.00), for the said assignment of license. * * * Second Party shall pay to First Parties as set forth below an amount of money equal to 6% of all the gross receipts of Second Parties from any and all classes, public or private or of any nature whatever, conducted under this license or by reasons of Second Parties' operation under this contract * * *. Second Party shall * * * make regular monthly payments to First Parties based upon Second Party's gross receipts for the preceding month for ten years or until the entire purchase price is paid whichever is sooner.

Under no circumstances will First Parties be entitled to any payment from Second Party after the ten year period.

The transfer shall be by assignment to be effective July 14, 1960. *The transfer shall be subject to the approval of Dale Carnegie and Associates (New York) formerly Dale Carnegie Publishers, Inc. and to the acceptance by it of Second Party as a sponsor under a new franchise.* * * * No further installment payments shall be due to the First Parties under the said assignment in the event that Dale Carnegie and Associates (New York) formerly Dale Carnegie Publishers, Inc., shall terminate the new franchise with the Second Party or if the said new franchise with Second Party should for any reason lapse. [Emphasis supplied.]

On June 20, 1960, petitioner entered into an agreement with Dale with respect to the aforementioned 24-county territory, pertinent provisions of which were as follows:

## WITNESSETH

1. Licensor grants to Sponsor a license for a basic period beginning July 14, 1960 and ending August 31, 1963 * * *. Upon expiration of such period, however, this agreement shall be deemed automatically renewed thereafter for successive renewal periods of twelve months, unless terminated at the end of such basic period or any such renewal period by written notice by either party to the other, given at least six months prior to the end of such period.

       *       *       *       *       *       *       *

25. *The purpose of the provisions, requirements and restrictions herein relating to the organization, offering and conduct of the Sales Course being solely to protect the good will and proprietary rights of Licensor in the use of its name and the name "Dale Carnegie" in connection with such course,* this agreement constitutes Sponsor an independent contractor and in no respect an agent, employee, partner, or associate of Licensor. [Emphasis supplied.]

       *       *       *       *       *       *       *

29. Sponsor shall not assign this agreement or any interest hereunder unless Sponsor shall first have obtained the written consent of Licensor so to do.

On July 14, 1960, petitioner entered into another agreement with Dale with respect to the territories covered by the June 20, 1960, agreement. The pertinent provisions of this new agreement were in all respects identical to those provisions of the earlier agreement quoted above.

Prior to May 1, 1961, the Metzler Institute, Inc. (hereinafter Metzler), was the Dale sponsor in three counties in northern New York State, including two counties of petitioner's present territory. On April 28, 1961, by letter agreement Metzler *released* its right to operate as a Dale sponsor in the three New York counties. On or about May 1, 1961, petitioner succeeded Metzler as sponsor in these counties. In consideration for the release and as a precondition to granting petitioner the new license, Dale had arranged to have petitioner agree to pay Metzler 10 percent of the tuitions received from the first 150 students enrolled by petitioner in the three-county territory.

The background to this last transaction is provided by a Dale letter dated April 26, 1961, and addressed to Metzler. The pertinent provisions of this letter are as follows:

Your letter of April 22 arrived this morning. Frankly I am disappointed in the wording of your release. The release of the three New York counties (Franklin, St. Lawrence & Jefferson) to Vic Stromsted is not and should not be predicated upon any consideration of us granting you a new and more favorable contract for all the rest of your territory. We cannot accept it on those premises.

When you left New York, after talking to Clark Bryson and me, the arrangements made and the understanding on our part was:

1. That you would release these counties outright so that we could issue them to Vic Stromsted.

2. In consideration for the above we would ask Vic (and Vic has subsequently agreed) to pay you an over-ride of 10% of the tuition income received from the first 150 students enrolled in any Carnegie Course in those three counties. We further asked Vic to stipulate (which he has also done) that he would organize promptly enough to complete the payments within a 36-month period.

3. There are no other conditions to the release of these three New York counties.

On May 1, 1961, petitioner entered into a new agreement with Dale covering 26 counties in New York State (23 of the 24 counties in which the Michels had been the licensees prior to July 14, 1960, and the three counties in which Metzler had been licensee prior to May 1, 1961). This agreement was substantially identical to the June 20, 1960, and July 14, 1960, agreements between petitioner and Dale.[4]

---

[4] Although by virtue of the prior licensing agreements between petitioner and Dale dated June 20, 1960, and July 14, 1960, petitioner had been given the authority to operate in Alleghany County, such authority was deleted in the May 1, 1961, agreement.

On September 1, 1961, Dale placed into general use a new form of licensing agreement. At this time Dale and petitioner, using the new agreement form, entered into a new agreement with respect to the same 26-county area covered by the prior agreement dated May 1, 1961.

The pertinent provisions of this new agreement were as follows:

7. *Basic time period of license.*

The license that is granted by Licensor to Sponsor in this agreement shall be for a period that begins at the opening of business on September 1, 1962 [sic] and that ends at the close of business on August 31, 1964 (herein referred to as the "basic period").

8. *Renewal period of license.*

The license that is granted by Licensor to Sponsor in this agreement shall be deemed to be automatically renewed for successive periods of twelve (12) months (each of which successive periods is herein referred to as a "renewal period"), unless this agreement is terminated under the provisions of Paragraph 85 or Paragraph 86.

 *  *  *  *  *  *  *

85. *Termination by mutual consent.*

This agreement shall terminate at any time the parties mutually consent in writing to termination.

86. *Termination by unilateral action if other party perpetrates fraud, etc.*

If any party to this agreement perpetrates any fraud, deceit, or dishonesty against another party to this agreement, the party against whom the fraud, deceit, or dishonesty is perpetrated may by notice given in writing inform the other parties of an intent that this agreement is to be terminated. * * *

 *  *  *  *  *  *  *

ASSIGNMENT OF AGREEMENT BY LICENSOR, ETC.

89. *Assignment.*

Licensor may assign this agreement to another corporation.

 *  *  *  *  *  *  *

ASSIGNMENT OF AGREEMENT BY SPONSOR ON SIX (6) MONTHS' NOTICE BY SPONSOR

91. *Sponsor's general right to assign agreement.*

Sponsor may assign this agreement to another named person (who may be either Intermediary or a person other than Intermediary) at the close of business on the last day in the basic period or a renewal period, provided Sponsor has by notice given in writing not less than six (6) months and not more than eleven (11) months prior to the date on which the assignment is to be effective, informed Licensor and Intermediary of Sponsor's desire to assign this agreement to such other person. *The authorization of Licensor and/or Intermediary to Sponsor so to assign this agreement to Intermediary shall not be necessary, but Sponsor may not assign this agreement to a person other than Intermediary unless authorization of Licensor to Sponsor so to do has been given in writing in the particular instance.* Licensor shall by notice given in writing inform Intermediary if Licensor gives such authorization to Sponsor. [Emphasis supplied]

ASSIGNMENT OF AGREEMENT BY SPONSOR ON THREE (3) MONTHS' NOTICE BY SPONSOR

92. *Assignment of agreement by Sponsor if notice that Licensor-Sponsor relation is to cease has been given by Licensor to Sponsor.*

Licensor may by notice given in writing inform Sponsor and Intermediary that the Licensor-Sponsor relation is to cease at the close of business on the last day in the basic period or a renewal period. * * * If such notice has been given, Sponsor may assign this agreement to another named person (who may be either Intermediary or a person other than Intermediary) at the close of business on the day on which the relation is to cease, provided Sponsor has, not less than three(3) months and not more than eleven (11) months prior to the day on which the assignment is to be effective, given Licensor and Intermediary notice in writing of Sponsor's desire to assign this agreement to such other person. The authorization of Licensor and/or Intermediary to Sponsor so to assign this agreement to Intermediary shall not be necessary, but Sponsor may not so assign this agreement to a person other than Intermediary unless authorization of Licensor to Sponsor so to do has been given in writing in the particular instance. Licensor shall by notice given in writing inform Intermediary if Licensor gives such authorization to Sponsor. *If Sponsor has not given the notice of Sponsor's desire to assign this agreement provided for in this paragraph, this agreement shall be conclusively presumed to have been assigned by Sponsor to Intermediary at the close of business on the day on which the relation is to cease.* [Emphasis supplied.]

    *         *         *         *         *         *         *

107. *License fee to be paid by Intermediary to Sponsor.*

Subject to the provisions of Paragraphs 108 and 109, if this agreement is assigned by Sponsor to Intermediary, Intermediary shall pay to Sponsor as a license fee an amount equal to fifty percent (50%) of the license fee that is paid by Intermediary to Licensor under the provisions of Paragraph 27 [license fee to be paid to licensor by sponsor] for a period of ten (10) years that begins on the day immediately following the day on which the assignment to Intermediary is effective. Payment of such license fee shall be made in monthly portions at the same time payment is made to Licensor * * *.

108. *Limitation upon license fee payable by Intermediary to Sponsor.*

Subject to the provisions of Paragraph 109, the total license fee payable by Intermediary to Sponsor if this agreement is assigned by Sponsor to Intermediary shall not be more than an amount equal to five (5) times the average annual license fee that was paid to Licensor by Sponsor and/or a predecessor sponsor from or through whom Sponsor's license emanated, under the provisions of Paragraph 27 or under similar paragraphs in any prior agreement between Licensor and Sponsor or such predecessor sponsor. The said average annual amount shall be based on the amounts received by Licensor from Sponsor and/or such predecessor sponsor in the thirty-six (36) months immediately preceding the month in which the assignment becomes effective . . .

109. *Alternative limitation upon license fee payable by Intermediary to Sponsor.*

Notwithstanding the provisions of Paragraph 108, if Sponsor had acquired Sponsor's original license from a predecessor sponsor by purchase before the Effective Date and if Sponsor had agreed to pay the person from whom such license was acquired an amount that is greater than an amount determined under the provisions of Paragraph 108, the amount Sponsor had so agreed to pay shall be substituted for the amount determined under the provisions of Paragraph 108 as the limitation upon the license fee payable by Intermediary to

Sponsor; but only if such substitute amount is less than the amount determined under the provisions of Paragraph 107. * * *

Prior to November 3, 1962, Fred B. Herman (hereinafter Herman) was the Dale licensee in eight western New York State counties. On November 3, 1962, petitioner and Herman entered into an agreement with respect to said eight counties, the pertinent provisions of which were as follows:

### ASSIGNMENT OF SPONSOR'S LICENSE AGREEMENT

3. *Assignment.*

Sponsor assigns sponsor's license agreement to Successor Sponsor *in accordance with the provisions of Paragraph 91 of Sponsor's license agreement,* and Successor Sponsor accepts such assignment. The said assignment shall take effect on the effective date. [Emphasis supplied.]

\*  \*  \*  \*  \*  \*  \*

5. *Effect of assignment.*

*This assignment shall not be deemed an assignment of the business of Sponsor to Successor Sponsor.* Sponsor shall not be deemed to have transferred to Successor Sponsor any property (other than sponsor's license agreement) owned by Sponsor at the effective date, and Successor Sponsor shall not be deemed to have assumed any liabilities or obligations of Sponsor at such time. [Emphasis supplied.]

\*  \*  \*  \*  \*  \*  \*

### LICENSE FEES TO SPONSOR

14. *Total license fee to be paid by Successor Sponsor to Sponsor.*

Successor Sponsor shall pay to Sponsor as a total license fee an amount equal to fifty percent (50%) of the total license fee that is paid by Successor Sponsor to Licensor under the provisions of Paragraph 107 of sponsor's license agreement for a period of ten (10) years that begins on the day immediately following the effective date; subject, however to the limitations hereinafter set forth.

15. *Limitation upon total license fee to be paid by Successor Sponsor to Sponsor.*

The total license fee to be paid by Successor Sponsor to Sponsor shall not be more than an amount equal to five (5) times the average annual license fee that was received by Licensor from Sponsor and/or of predecessor sponsor from or through whom sponsor's license emanated, under the provisions of Paragraph 108 of sponsor's license agreement or under the provisions of any similar paragraph in any prior agreement between Licensor and Sponsor or such predecessor sponsor. * * * *Sponsor represents to Successor Sponsor that Licensor has, by notice given in writing, informed sponsor that the said average annual amount is the amount to be used in lieu of an average annual amount determined in accordance with the preceding sentences* [emphasis supplied] of this paragraph is *Fifty-two Thousand Six Hundred Fifty-Nine Dollars* ($52,659.00). The said notice of Licensor is attached to this contract for information. Sponsor and Successor Sponsor acknowledge the said amount as correct.

15A. *Alternative limitation upon total license fee to be paid by Successor Sponsor to Sponsor.*

Sponsor represents to Successor Sponsor that Sponsor had acquired a portion of license from a predecessor sponsor by a purchase made before the contract date. Successor Sponsor acknowledges that Sponsor has shown Successor Sponsor a copy of Sponsor's agreement dated May 29, 1958, respecting such acquisition

of a portion of Sponsor's license by purchase. Successor Sponsor further acknowledges that he is familiar with the contents thereof. Sponsor and Successor Sponsor acknowledge that the amount Sponsor had agreed to pay is $20,250.00, or until the time limit of May 28, 1968 (ten years from the May 28, 1958 date of the agreement) whichever comes first.

\*   \*   \*   \*   \*   \*   \*

To date Six Thousand Dollars ($6,000.00) has been paid on this purchase, leaving a balance of Fourteen Thousand Two Hundred Fifty Dollars ($14,250.00).

Under terms of this agreement Successor Sponsor will pay 6% of all collections made in above mentioned counties to Edward J. Michel until the $14,250.00 has been paid or the time limit of May 28, 1968, whichever comes first.

If Edward J. Michel is paid $14,250.00 prior to May 28, 1968, 6% of the collections from this area will be paid to Sponsor after indebtedness to Edward J. Michel has been paid.

If $14,250.00 has not been paid to Edward J. Michel by May 28, 1968, payments to Edward J. Michel by Successor Sponsor will cease at that date and payments thereafter from this area will be made to Sponsor.

The balance due on this contract $38,409.00 ($52,659.00 total cost of area, less amount due Edward J .Michel $14,250.00) to be paid by Successor Sponsor at the rate of 6% on all collections from Erie County with the exception of the Town of Tonawanda.

On November 26, 1962, Herman and petitioner amended the above agreement to provide as follows:

This agreement has reference to Section 15A of the contract between these two parties dated November 3, 1962.

A portion of 15A reads

"The balance due on this contract $38,409.00 ($52,659.00 total cost of area, less amount due Edward J. Michel $14,250.00) to be paid by Successor Sponsor at the rate of 6% on all collections from Erie County with the exception of the Town of Tonawanda."

Fred Herman to consider the balance due on the contract, $38,409.00, paid in full on receipt of Ten Thousand Dollars ($10,000.00). Five thousand dollars ($5,000.00) to be paid immediately, with the remaining five thousand dollars ($5,000.00) to be paid in 1963, with every effort to be made by Victor Stromsted to pay this balance as soon as possible.

On January 1, 1963, petitioner entered into a new license agreement with Dale. The agreement covered the eight counties assigned to petitioner by Herman and was to run from January 1, 1963, to August 31, 1964. In all material respects the form of the agreement was identical to the licensing agreement entered into by petitioner and Dale on September 1, 1961.

Pursuant to the aforementioned agreements with the Michels, Metzler, and Herman, petitioner paid the following amounts during the years 1962 through 1965:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1962 | $13,228.63 | 1964 | $10,818.19 |
| 1963 | 21,050.73 | 1965 | 11,926.14 |

Petitioner deducted the full amount of these payments on his income tax returns for the years 1962 through 1965. Respondent disallowed these deductions in his notice of deficiency, stating the following as grounds for such disallowance:

(a) The deduction claimed for royalties for the year[s 1962, 1963, 1964 and 1965] has been reduced by the amount[s of $13,228.63, $21,050.73, $10,818.19 and $11,926.14] because [these] amount[s] represent capital expenditures incurred for the purpose of acquiring licenses or franchises to conduct "Carnegie" courses in certain geographical areas.

OPINION

During the years 1962 through 1965, petitioner made payments totaling $57,023.69 to the three Dale sponsors who had preceded him in the 34 franchise territories worked by petitioner. On his income tax returns for these years, petitioner treated the payments as royalties and sought deductions in each of the 4 years in an amount equal to these payments. Respondent disallowed these deductions on the ground that they were capital expenditures incurred for the purpose of acquiring Dale franchises in the geographical areas involved.

Petitioner's petition filed with this Court then treated these payments as consideration for an intangible capital benefit. The argument raised in the petition was that the full amount of the payments made to obtain this intangible capital asset was amortizable in the respective years in which payment was made. However, at the trial of the case and in an amended petition filed with the approval of this Court, petitioner sought to invoke an additional theory not previously employed; and urged that, notwithstanding his prior characterizations of the payments in question, a fair analysis of the case warranted the legal and factual conclusion that the payments made by petitioner to his predecessor sponsors constituted continued income interests retained by each of these parties and were, therefore, not taxable to petitioner.[5]

Accordingly, the primary question presented is whether petitioner's predecessors held a retained income interest in the amounts paid to them by petitioner during the years in issue. We hold that these

---

[5] At trial respondent did not object to the granting of petitioner's request to amend his petition. However, on reply brief, respondent argued that the retained income issue was not before this Court because petitioner had not filed a written request for leave to amend his petition. Leave to file an amended petition (along with the amendments therein sought) was, however, filed on Sept. 13, 1968, after all briefs had been submitted. An answer to the amended portion of the petition was filed by respondent on Sept. 26, 1968. We hold that, despite petitioner's delay in filing a written request for leave to amend the pleadings, the issue raised in the amendment to the petition is properly before this Court, it having long been held that an amended pleading may be filed, with leave of this Court, at any time prior to the entry of a final decision by this Court. *Commissioner* v. *Finley,* 265 F. 2d 885, 888 (C.A. 10, 1959), affirming a Memorandum Opinion of this Court, and cases there cited.

amounts were (a) earned by petitioner, and (b) did not constitute an income interest retained by his predecessors.

We have carefully researched the case law pertinent to this area of our investigation and have found no cases on all fours with the unique factual issue presented in this case. The cases we have found which deal with retention of income and/or franchise contracts in general are, however, instructive.

Generally, where post-sale income is returned to the seller, the courts have had to decide, as a question of fact, whether the seller intended to reserve to himself post-sale income. *Larry D. Hibler*, 46 T.C. 663 (1966), affirmed per curiam 383 F. 2d 989 (C.A. 5, 1967), certiorari denied 390 U.S. 949 (1968); *Vermont Transit Co.* v. *Commissioner*, 218 F. 2d 468 (C.A. 2, 1955), affirming 19 T.C. 1040 (1953), certiorari denied 349 U.S. 945 (1955).

The tax consequences of the transaction must be determined not only by the form in which the transaction is cast, but also by the substance of what occurred. The terms used by the parties to describe post-sale payments under a contract may not necessarily determine the tax consequences attached to such payments. *Hamme* v. *Commissioner*, 209 F. 2d 29 (C.A. 4, 1953), affirming a Memorandum Opinion of this Court, certiorari denied 347 U.S. 954 (1954). Hence, in *Olin Bryant*, 46 T.C. 848 (1966), aff'd. 399 F. 2d 800 (C.A. 5, 1968), the issue was whether a "production payment" to be paid from 10 percent of buyer's gross farm income, with 7-percent interest accruing on the unpaid balance, represented a retained interest by the seller or income taxable to the buyer. We held that the income which generated the payments to the seller was taxable to the buyer on the grounds that (a) though the transaction was cast in "production payment form," the seller was only concerned with receiving a fixed amount of dollars (as reflected by the incidence of interest charges which were to accrue with the deferment of payment); and (b) the transaction was structured in the "production payment form" solely at the behest of the buyer.

In addition to closely scrutinizing the intent of the parties in a transaction, such as the one which occurred in *Bryant*, the courts have also looked to other factors to determine whether post-sale income should be taxed to the buyer or to the seller.

Accordingly, it has been held that where the total amount of the income payments made to the seller is not fixed, but is instead based upon the success or failure of the transferred business, such circumstance is an important consideration in concluding that the payments will be regarded as a continuing interest in the seller. See, e.g., *Moberg* v. *Commissioner*, 365 F. 2d 337 (1966), affirming a Memorandum Opinion of this Court (Oct. 22, 1963); and *Ruth W. Collins*, 14 T.C.

301 (1950). On the other hand, it is well settled that income is taxed to the party who earned it. *Lucas* v. *Earl*, 281 U.S. 111 (1930). Hence, in *Larry D. Hibler, supra*, we rejected the petitioner's claim that renewal commissions, received by him, and which he was obligated to pay his predecessor as a result of the purchase of certain policy expirations, constituted a reserved income interest in his predecessor not taxable to the petitioner. Our determination was premised on the fact that since the insurance policies there in question were not automatically renewable, the renewal commissions paid to petitioner's predecessor could only be attributed to labor expended by the petitioner. As such, these commissions were held to have been earned by the petitioner since his efforts, alone, gave rise to the commission income.

Just as in *Hibler*, the petitioner herein was the sole generating force behind the income paid to his predecessors. Only through petitioner's efforts was it possible for each of his predecessors to receive the disputed payments of income. Moreover, not one of the outgoing sponsors retained anything resembling an economic or property interest in the franchises granted to petitioner by Dale. In terms of both labor expended and property interests held, it was petitioner who earned the income in question.

Granted, each of petitioner's predecessors held a contractual right to receive periodic returns based upon the income earned by petitioner. However, the obligation which gave rise to these rights rested with Dale, and not petitioner. Though enforceable against Dale, the rights vested in each of the outgoing sponsors could not be regarded as an economic interest which would attach to the license rights conferred on petitioner by Dale. The purported assignments entered into by petitioner with each of his predecessor sponsors merely formalized the terms of his license agreement with Dale, whereunder petitioner was made to assume Dale's obligation to pay each of the outgoing parties the periodic payments in question.[6]

---

[6] With regard to petitioner's promise to pay Herman the sum of $52,659, such payments to be made over a 10-year period, we think it clear that had petitioner not assumed these payments, Dale's Intermediary, pursuant to pars. 107 and 108 of Dale's license agreement with Herman, would have been obligated to do so. Herman, at the time of his purported assignment to petitioner, possessed a chose in action in the seriatim amounts described in pars. 107 and 108. This right was extant and enforceable at the time the Dale-Herman license was terminated, and Dale, by its commitment, had assured Herman of a certain percentage of the future proceeds derived from Herman's former territory.

As to petitioner's promise to (a) pay the Michels 6 percent of gross profits for 10 years with a ceiling of $63,000 and (b) pay Metzler 10 percent of the tuitions received from the first 150 students enrolled by petitioner in the franchise area previously worked by Metzler, a somewhat different form of analysis is required. Both the Michels and Metzler obtained their respective licenses from Dale prior to Sept. 1, 1961—the date when the new form license contract was put into effect by Dale. The new contract contained the provision guaranteeing a sponsor the right of automatic assignment to Dale's Intermediary and also provided for the 10-year payments in the event such an assignment was made. There was no analogue to these provisions in the license agreements, such as those entered

There is no other rationale to explain why a new sponsor would be willing to enter into agreements as illusory as those reached by petitioner and his three predecessors. To conclude otherwise would be to disregard our findings of fact wherein we clearly stated that once a sponsor's license was terminated he had virtually nothing to sell. Even the lists of former students which a new sponsor might have expected to receive from his predecessor were without value for rarely would a former student ever repeat a Dale course. Similarly, to the extent a predecessor sponsor had been successful in recruiting students for the various Dale courses, the territory worked by such prior sponsor offered less recruiting potential than one totally undeveloped.

Distilled to its simplest terms, what we have in this case is a third-party beneficiary agreement between Dale and petitioner wherein, as part of the cost of acquiring the franchise territories worked by his predecessors, petitioner agreed to make the income payments in question.

As suggested in *Hamme* v. *Commissioner, supra*, under circumstances such as these, the terms used by the taxpayers in characterizing the nature of a transaction need not be determinative of the tax consequences ascribed to the transaction. The testimony of the witness, John Cooper, the language used by petitioner and Herman in the "assignment" arrangement entered into by them,[7] and the letter written by Dale to Metzler [8] lead us to the firm conclusion that the terms of the overriding license agreement between Dale and petitioner are determinative of the tax consequences which should be ascribed to the illusory agreements entered into between petitioner and each of his three predecessors. Accordingly, we hold that the payments which purportedly arose from these agreements were part of the cost of acquiring a franchise license which only Dale was free to grant. As such, we hold for respondent.

We also reject petitioner's alternative contention that the payments made to his predecessors were amortizable or depreciable during the years in which payment was made. Section 1.167(a)–3, Income Tax

---

into by the Michels and Metzler, which took place prior to Sept. 1, 1961. Dale's obligation to provide payments such as the Michels and Metzler was, therefore, informal and, though (since 1958) fundamentally rooted in Dale's overall philosophy, nevertheless self-imposed. Whether the Michels and Metzler had an enforceable claim against Dale to make good on its assumed obligation is, therefore, a question of fact, depending on whether Dale and these outgoing sponsors regarded Dale's policy of assuring such payments as a sine qua non to the original license agreement. Though the record is not clear, we believe that Dale's assurance that such payments would follow termination was an implicit and actionable requisite of Dale's license agreement with both the Michels and Metzler.

[7] Art. 15 of the "assignment" between Herman and petitioner (reproduced at p. 338) establishes that the amount which petitioner agreed to pay Herman was dictated by Dale.

[8] This letter, which has been reproduced in part, *supra*, clearly shows that Dale was "calling the shots" with regard to the payments which petitioner made to Metzler.

Regs., makes it clear that intangible capital assets having an indeterminate useful life will not be subject to a deduction for depreciation (or amortization). In the case before us it is clear that the useful life of the franchise licenses granted to petitioner could not, during the years in question, be determined with any degree of certainty. The reason being that each of the license agreements contained an automatic renewal clause whereby, after the expiration of a relatively brief initial term, the license would be automatically renewed on an annual basis unless either party notified the other to the contrary. Given these facts, deductibility under section 167 must be denied. Cf. *Westinghouse Broadcasting Co.*, 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963).

*Decision will be entered for the respondent.*